**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**RICH'S PRECISION FOUNDRY, INC., Respondent.**

No. 81–1236.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1981.

Decided Dec. 15, 1981.

---

James Donathen, Elliott Moore, N. L. R. B., Washington, D. C., for petitioner.

Loren J. Comstock, Abbott, Comstock & Goeres, Indianapolis, Ind., for respondent.

Before PELL and CUDAHY, Circuit Judges, and DUMBAULD, Senior District Judge.*

PELL, Circuit Judge.

This case arises on the petition of the National Labor Relations Board (Board or NLRB) for enforcement of its order finding the Respondent, Rich's Precision Foundry, Inc. (Company), in violation of §§ 8(a)(1) and (3) of the National Labor Relations Act *as amended*, 29 U.S.C. §§ 158(a)(1) and (3) (1976). The Company has cross-petitioned this court pursuant to 29 U.S.C. § 160(f) to review and set aside the order. The primary issues for our determination are whether the Board's findings that the Company violated §§ 8(a)(1) and (3) were supported by substantial evidence on the record as a whole and whether the employees allegedly discharged for union activities were supervisors excluded from the protection of the Act.

The Board[1] found that the Company violated § 8(a)(1) of the Act by maintaining an overly broad no solicitation and no distribution rule, threatening employees with discharge and plant closure for union support, conveying to employees an impression of Company surveillance of union activities, interrogating employees about union activities, soliciting an employee to engage in anti-union activity, and inducing employees to abandon the union by granting an increased Christmas bonus. The Board also found that the Company violated §§ 8(a)(1) and (3) of the Act by discharging Felix Birt and Homer Acres for their union activities and by laying off Kurt Elder and Greg Schumacher temporarily for lack of work until replacements for Birt and Acres were arranged. The Board ordered the Company to cease and desist from the unfair labor practices, to reinstate Birt and Acres, to make whole Birt, Acres, Elder, and Schumacher for all wages lost as a result of their unlawful layoffs, and to post an appropriate notice to inform the employees of these actions.

## I. THE FACTUAL BACKGROUND

### A. The Company's Operations and Personnel

The Company manufactures and distributes brass and aluminum castings at its foundry in Yorktown, Indiana. The Company employed approximately 65 people at the time of the alleged violations. The management and supervisory personnel of the plant included Richard Reece, owner and president; Steven Bailey, plant manager; and several foremen, including Dewey Miller and David Bennett. One of the Company's shop rules subjected employees to discipline for "distribution of any literature of soliciting or selling of any kind during working hours."

Prior to their discharges, Felix Birt and Homer Acres were employed at the plant as senior molders. Acres and Birt, in the course of their duties, gave assistance and instruction to the other less experienced molders in their department. The Compa-

---

* The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, sitting by designation.

1. Inasmuch as the Board affirmed the "rulings, findings, and conclusions" of the administrative law judge and adopted his order without any significant change relevant to our review, the decision, order, and opinion of the administrative law judge will herein be referred to as the decision, order or opinion of the Board.

ny asserted that these instructional duties excluded Birt and Acres from the coverage of the Act as supervisors under 29 U.S.C. § 152(3) (1976). In support of its position, the Company introduced a December, 1978 organizational chart which included Birt and Acres in a list of foremen. President Reece testified their names were thus listed simply "because they're foremen;" a molder, Greg Schumacher, who worked with Birt, testified that Reece had once told him that Birt was a foreman.

## B. Threats Against Union Organization

Birt testified that in mid-June Reece stated in a conference with the molders that there "definitely [would be] no union" and that "anyone caught talking about a union would be fired." Bailey and Miller, who were present at the meeting, testified that they had never heard Reece make such a statement. Reece did not testify as to the incident.[2]

In August or September, Birt and Acres began to talk to the other employees about organizing a union due to dissatisfaction with wages and working conditions. In November, Acres and Birt, along with the other molders, ceased work to protest the Company's failure to install a shield on an overhead hopper. As spokesman for the molders, Birt met with Reece, Bailey, and Miller to request the Company to install the shield and grant a future pay raise. Birt said he warned them at one point that "if they [the company] didn't ... that we would get a union up." Approximately the last week in November, Birt and the other molders were discussing with foreman Miller the possibility of a union contract. Birt said that if the employees did not get a raise, they would "get a union," to which Miller replied they "couldn't do that" and "if [they] did, that they would close the door first." Miller did not deny making this statement.

## C. The Locker Search

About December 1, Acres distributed to the employees a union pamphlet outlining examples of illegal conduct by an employer during a union campaign. On December 5, Miller and Bailey conducted a search of Birt's locker at the foundry. Birt testified that Miller and Bailey "said that they saw an employee from the cleaning room reading a piece of paper, and they have reason to believe that it had something to do with the union that could hurt the company, and they wanted to search my locker." Another witness corroborated that Miller had said that he was searching for a paper that an employee had been reading. Bailey testified that Miller had suggested the search because "he believed that Felix [Birt] had something that he should not have." He also confirmed that Miller had told Birt that he believed Birt had something "that would be a detriment to the company." Upon searching the locker, Miller pulled out a piece of paper which turned out to be a tardiness warning on the back of a copy of the shop rules. Bailey then apologized to Birt but indicated he was "very disappointed." There was testimony that an employee had been dismissed for drug problems one month earlier and that there had been some problems with employees drinking alcoholic beverages in the plant.

## D. The Questioning of Anna Caldwell by Manager Bailey

Between December 5 and 7 Birt arranged a union organizational meeting for the evening of December 7. Both Birt and Acres publicized the meeting to the employees. In the morning of December 7, Bailey called a cleaning lady at the plant, Anna Caldwell, into his office. He asked her the nature of her discussion with other employees, including Acres, in the lounge, to which she replied that she had been talking with Acres about "bootlegging." According to Cald-

---

**2.** There was also testimony by Birt that Reece had said in a May meeting that "he'd close the doors ... before he'd go union." Bailey, who was present at the meeting, denied hearing Reece make such a statement. Although the May incident occurred outside the six-month statutory limitation period, the administrative law judge considered it only as background evidence shedding light on matters within the period.

well, Bailey responded, "Now, come on Anna, what were you talking about?" She replied that that had been all they were talking about, but if he "was asking about the union" she would be "the first to sign the card." She then left Bailey's office without any further discussion.

### E. The Discharges of Birt, Acres, Elder, and Schumacher

A union organizational meeting was held on December 7 in which several employees, including Acres, Birt, Caldwell, Elder, and Schumacher, signed cards in support of the union. The next day, Reece instructed the plant manager Bailey and foreman Miller to discharge Birt and Acres but to say they were being laid off for lack of work so that they could draw unemployment benefits. Birt and Acres testified that around one o'clock in the afternoon Miller and Bennett told them to clean out their lockers and go to Bailey's office. Acres also testified that he had work to do when he was approached by Miller and Bennett. When Acres and Birt arrived to meet with Miller, Bennett and Bailey in Bailey's office, they were told by Bailey they were being "laid off." When Birt and Acres asked if they were being fired, Miller explained they were being laid off so they could draw unemployment. Birt also testified that Miller told them, "I warned you I would get you sooner or later." Acres and Birt then obtained their paychecks and left the foundry.

Their discharges resulted in shutdown of two production lines. Kurt Elder and Greg Schumacher, who worked with Birt and Acres on these production lines, were temporarily laid off when they ran out of work to perform as a result of Birt's and Acres' discharges. Elder and Schumacher were recalled approximately one week later after Birt's and Acres' positions had been filled.

### F. The Unemployment Claims

Both Birt and Acres filed claims for unemployment compensation. In response to a notice of the claims from the Indiana Employment Security Division, Bailey certified on an Eligibility Information Report that Birt and Acres were ineligible for unemployment. The reason given on the form was that they had been laid off "partially due to lack of work" but would not be re-employed due to their "insubordination, poor performance, refusal to accept supervision, and in general ... defiant attitude." The Company does not appear to have otherwise contested their eligibility.

### G. The Company's Statements and Conduct After the Discharges

On December 15, Acres went to the foundry to pick up his last paycheck. Reece's secretary told Acres that he could have his paycheck after he had talked to Reece. According to Acres, Reece told Acres to "go out and tell the people that the damn union wasn't no good," and to ask Miller for his job back. Reece also asked how many people were at the union meeting the day before. When Acres replied that Reece "didn't have to ask because he already knew," Reece asked Acres to meet with Bailey, Miller, and himself that afternoon. Acres did so, and during the meeting Reece said that "before he would have a union he would close the damn doors." Acres said that Reece then told him he "was the highest paid man that he had, and why was I in on this, I was the leader of the whole group, I was following Mr. Birt and everybody else was following me." Acres also testified that Reece advised him that he could come back to work "if [he would] just put the union down."

The same afternoon Geraldine Cook, who shares an apartment with Acres that they rent from Reece, went to the foundry to pay Reece the monthly rent. According to Cook, Reece asked her "what was the trouble" with Acres. When Cook replied that she did not want to get involved, Reece said, "I don't want a union in here, and I want things straightened out." He also told her it was "not necessary to be late with the rent" and that "all he [Acres] has to do is come back and ask Dewey [Miller] for his job back, and talk the union down." Cook's and Acres' testimony as to their encounters with Reece on December 15 were uncontroverted.

Approximately one week later, the Company gave its employees $50.00 cash bonuses instead of a ham, turkey, or fruit as had been done in the past. In the Christmas party, Reece made a speech during which, according to employee Otis Cherry, he stated that he "couldn't afford to have a union in the place and pay discrimination wages; if he did, he'd have to close the doors."

In January of 1979, Acres returned to the plant to pick up his W-2 forms. Acres testified that Reece again asked him to "put down the union, and ask Mr. Dewey Miller for [his] job back."

The original charge alleging unfair labor practices on the basis of these events was filed with the NLRB on December 11, 1978. The parties entered into a settlement on May 22, 1979 which was set aside by the Regional Director on June 29, 1979 due to the Company's refusal to comply with the terms of the settlement. In its post-trial brief after the conclusion of the hearing before the administrative law judge, the Company justified its refusal to comply as follows:

> Formal settlement was once effected in this matter and subsequently withdrawn upon Respondent's realization that the Complainant [Birt] and Acres were guilty of conduct which constituted legitimate defenses to the charges and constituted just cause for the discharge of Birt and Acres.

The Board contends that this statement demonstrates that the purported grounds for the discharges of Birt and Acres were merely after-acquired pretexts for the retaliatory discharges.

H. The Company's Evidence of an Intentional Slowdown by Birt and Acres

The first time that the Company advanced what it claimed to be its actual reason for laying off Birt and Acres was in the testimony in the administrative hearing. Reece stated that Birt was laid off due to "evidence from several papers and data that we fill out every day that there was an automatic slowdown" and that Acres was similarly laid off for an "intentional slow-down." Reece said that he had based his decision on their production data. He later identified the data as "several years' experience, production slips . . . [and] scrap tickets," although he later testified that the scrap tickets had "not that much" to do with his decision to lay off Birt. He admitted that the slowdown had come to his attention a couple of months prior to December 8, but claimed that he did not take any action until then because he wanted to "straighten it out . . . through morale and management." The only evidence of any action taken by management prior to December 8 is Reece's testimony that foreman Miller and manager Bailey had talked to Birt and Acres. Neither Bailey nor Miller testified as to any such discussions with Birt or Acres having taken place.

However, Reece subsequently testified that a comparison between Birt and Acres and the other molders could not be made from the production records from September to December 8 because all the molders were involved in the slowdown. In contrast to his earlier testimony, Reece claimed that he had chosen to lay off Birt and Acres because they were "leaders . . . responsible for training" the other molders, although he conceded they were only responsible for training when foreman Miller was absent from the floor. When the apparent contradiction in his testimony as to the reason for the discharges was brought to Reece's attention, Reece again revised his position to state that Birt and Acres were laid off for not being leaders in terms of maintaining the morale of the other molders.

There was testimony in the hearing from Company. employees that Birt and Acres had made statements to them in October and November to the effect that they were intentionally going to slow down production. Greg Schumacher, who poured metal for both Birt and Acres in November and· December of 1978, testified that he had noticed an absence of molds from their production lines although there did not appear to be any shortage of the necessary materials at that time. The availability of adequate materials was substantiated by both Miller and Bennett. Other employees testi-

fied that, during this time, some cores used in the molding process had stacked up in the core room because they were not being used by the molders at the usual rate. One of the core room employees remarked that the back-up of cores began to disappear after Acres had been replaced. Acres and Birt both denied any statements as to a threatened slowdown.

The documentary evidence introduced by the Company to manifest the slowdown consisted of daily production records for September to October and a summary of the Company's gross sales for 1978. The Company's gross sales for September were $45,762.66; for October $117,694.59; for November, $107,237.96; and for December, $70,968.64. Plant Manager Bailey asserted that gross sales were a direct reflection of the molders' production. The production records, according to both parties, showed that Acres had averaged 111 pieces per day from a commonly used mold and that Birt had averaged 80 per day from the same mold for the months of October, November and December. There was some testimony that the Company had had problems with this specific type of mold in late 1978 and, as a result, had made some changes in production methods both before and after the discharges. The records also showed that Birt's scrap rate in December exceeded his scrap rate and that of other molders in previous months. The Company also introduced evidence that a molder with relatively little experience, who had been hired for the molder position after the discharges, averaged 116 pieces per day in February and March of 1979 from the mold upon which Birt's and Acres' averages were also based.

## II. THE § 8(a)(1) VIOLATIONS.

### A. Solicitation of Acres for Anti-Union Activities and Conditioning His Re-Employment on Such Activities

▆▆▆▆ Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their rights to organize and bargain collectively through representatives of their own choosing. 29 U.S.C. § 158(a)(1) (1976). Initially, we note that the Company has not contested in its brief or oral argument that it violated § 8(a)(1) by soliciting Acres to engage in anti-union activity and by conditioning his re-employment upon his engaging in such activity. It is well established that an employer violates § 8(a)(1) by soliciting employees to engage in anti-union activity, and by conditioning the re-employment of discharged employees upon engaging in such activity. *TRW-United Greenfield Division v. NLRB*, 637 F.2d 410 (5th Cir. 1981); *NLRB v. Wagner Iron Works*, 220 F.2d 126 (7th Cir. 1955), *cert. denied*, 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956). Accordingly, the Board's finding that the Company violated § 8(a)(1) by soliciting Acres for anti-union activities and conditioning his re-employment on these activities is supported by substantial evidence on the record as a whole and is enforced without the necessity for further discussion. *Dreis & Krump Manufacturing Co., Inc. v. NLRB*, 544 F.2d 320 (7th Cir. 1976).

### B. The No Distribution and No Solicitation Rule

The Board, relying on *Essex International, Inc.*, 211 N.L.R.B. 749 (1974)[3] and *C&W Mining Co., Inc.*, 248 N.L.R.B. 270 (1980), found that a shop rule prohibiting solicitation or distribution of any kind during working hours, without further refinement or definition by the employer and notice thereof to the employees, infringes on the employees' right to engage in union solicitation and distribution on their breaks and lunchtime, as set forth in *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).

---

**3.** The Board has since overruled *Essex* in part, on grounds that do not affect the present case. In *Essex*, the Board concluded that a prohibition against solicitation during working hours was presumptively invalid, but a prohibition against solicitation during working time was not. In *TRW Bearing Division v. Anderson*, 257 N.L.R.B. No. 47 (July 3, 1981), [1980–81] Lab.L.Rep. (CCH) ¶ 18,164, the Board concluded that a prohibition against solicitation during working time was also presumptively invalid.

■ Although our attention has not been directed to a case in this court explicitly addressing the specific issue of whether a prohibition of solicitation during working hours is impermissibly broad, we hold that the rule, in the absence of evidence that it was narrowly enforced and the employees were informed of such enforcement, is unlawfully broad. The rule is susceptible to an overly broad interpretation that would unlawfully infringe employees' rights by prohibiting solicitation and distribution of union materials from the beginning to the end of the workshift, including breaks and lunchtime. *See generally W. W. Grainger, Inc. v. NLRB*, 582 F.2d 1118 n.3 (7th Cir. 1978), *enforcing* 229 N.L.R.B. 161 (1977). The existence of an overly broad rule may violate § 8(a)(1) even without a showing that it had been enforced because its mere existence may chill the exercise of section 7 rights. *Utrad Corp. v. NLRB*, 454 F.2d 520, 523–24 (7th Cir. 1971). Accordingly, the Board's finding that the rule violated § 8(a)(1) is enforced by this court.

## C. Threats of Discharge and Plant Closure for Union Activity

■ For the remaining § 8(a)(1) violations, the Board's order must be enforced if the Board's findings are supported by substantial evidence based on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893 (7th Cir. 1981). Moreover, absent exceptional circumstances, credibility determinations made by the administrative law judge ordinarily will not be disturbed on review. *Sarkes Tarzian v. NLRB*, 374 F.2d 734 (7th Cir. 1967), *cert. denied*, 389 U.S. 839, 88 S.Ct. 64, 19 L.Ed.2d 102 (1967).

■ Again we note that the Company did not contest before the Board or before this court the administrative law judge's finding and conclusion that Reece had threatened in June to discharge anyone caught talking about a union. Nor did the Company contest the administrative law judge's finding and conclusion that Miller had threatened Birt that the Company would "close the door" before it would have a union. Under § 10(e) of the Act, 29 U.S.C. § 160(e) (1976),[4] the Company's failure to object to these findings precludes review in this court absent a showing of extraordinary circumstances excusing its failure. *NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691 (7th Cir. 1976). Under these circumstances, the Board is entitled to summary enforcement of that part of the order finding that Miller's threat and Reece's threat in June violated § 8(a)(1).

As to Reece's alleged threats of plant closure in the Christmas party and on December 15, the Company first argues that the general testimony of several Company witnesses that they had never heard Reece make such threats should be credited over that of Acres as to the December 15 incident and that of Otis Cherry, Birt's brother-in-law, as to the Christmas party incident. Reece did not testify whether he made any of the alleged threats.

The administrative law judge specifically pinned his findings of these § 8(a)(1) violations on his evaluation of the credibility and demeanor of the witnesses. The administrative law judge determined that Reece's failure to deny the statements supported both Acres' and Cherry's credibility. As further support of Cherry's credibility, the administrative law judge noted that Cherry continued to work for the Company, and concluded, "the undenied testimony of an employee whose livelihood is controlled by the employer against whom he testifies should be given credence." We see no exceptional circumstances which would warrant our reversal of the administrative law judge's credibility determination.

■ Credibility determinations aside, the Company, relying on *Singer Co. v. NLRB*,

---

**4.** Section 10(e), 29 U.S.C. § 160(e) (1976), provides in part:

No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

429 F.2d 172 (8th Cir. 1970), contends that the uncorroborated testimony of a single witness cannot constitute substantial evidence on the record as a whole. However, *Singer* merely stands for the proposition that "the uncorroborated testimony of an untrustworthy and interested witness, who stands to profit from a back pay award, may be held under such facts and circumstances not to constitute substantial evidence on the record as a whole." *Singer Co. v. NLRB*, 429 F.2d 172, 180 (8th Cir. 1970), *quoting NLRB v. Barbertron Plastics Products, Inc.*, 354 F.2d 66, 69 (6th Cir. 1965). In light of all the circumstances in this case, we do not regard either Cherry or Acres as an untrustworthy witness. As the Board's opinion noted, Cherry had little to gain and much to lose from his testimony. Nor did he stand to gain personally from any back pay award. There is also sufficient indicia of Acres' trustworthiness as a witness for his testimony to constitute substantial evidence on the record as a whole. The Company advanced no basis for finding Acres untrustworthy other than his interest in the back pay award. Acres, as was the case with the witness in *Singer*, was a veteran, highly valued employee until the incidents leading to his discharge. He had no history of false statements or other misconduct. Accordingly, there was substantial evidence on the record as a whole for each of the Board's findings that the Company violated § 8(a)(1) by threats of discharge and plant closure for union activities.

Alternatively, the Company contends that, in any event, any alleged threats of plant closure made by Reece in the Christmas party were not threats but predictions of the economic consequences of union organization which fall outside the ambit of § 8(a)(1). *See, e.g., NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Cherry testified that Reece had stated "he couldn't afford to have a union in the place and pay discrimination wages;

if he did he'd have to close the doors." An employer's prediction, however,

> must be carefully phrased on the basis of objective facts to convey ... demonstrably probable consequences or ... a management decision already arrived at.... If there is any implication that an employer may ... take action solely on his own initiative for reasons unrelated to economic necessity ..., the statement is ... but a threat of retaliation.

*NLRB v. Gogin*, 575 F.2d 596, 600 (7th Cir. 1978), *quoting NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969).

■ The Company made no effort in the hearing[5] to show that Reece's statement that "discrimination wages" would necessitate closing the plant, the only statement even arguably some form of economic prediction, was anything other than a threat. In this petition and before the Board, the only evidence of economic consequences asserted to justify Reece's statement is a statement in the Board's opinion that the Company was in difficult financial circumstances. Substantial evidence demonstrated that the intent and purpose of all three statements were, and were correctly determined by the Board to be, threats of retaliation.

■ Nor does the case of *NLRB v. Larry Faul Oldsmobile Co.*, 316 F.2d 595 (7th Cir. 1963), cited by the Company, affect our decision. In *Faul*, a manager's statement that "he might as well as throw the place up for grabs" was made in response to a direct question as to the future of the company by an employee who had already been discharged. Under those circumstances, the court determined that the statement could not in any sense be interpreted as a threat against unionization to current employees. In this case, Reece's statement was made in a speech to current employees shortly after a union organizational drive. The Board

---

**5.** In its brief, the Company relied on testimony by Reece that the Company had been delinquent in payment of withholding taxes. Reece's statement, however, was not made in relation to his statement that unionization would force the plant to close; it was in response to General Counsel's introduction of a plea of guilty on July 30, 1979, to delinquency in payment of withholding taxes in order to impeach Reece's credibility.

was thus warranted in finding that the statement was coercive and thus violated § 8(a)(1).

### D. Coercive Interrogation of Employees

 Section 8(a)(1) does not *per se* prevent any employer from questioning employees about unionization efforts. *NLRB v. C&P Plaza Department Store*, 414 F.2d 1244 (7th Cir. 1969), *cert. denied*, 396 U.S. 1058, 90 S.Ct. 756, 24 L.Ed.2d 754 (1970). Employee interrogation only becomes a § 8(a)(1) violation if the questions asked, when viewed and interpreted as the employee must have understood the questioning and its ramifications, could reasonably coerce or intimidate the employee with regard to union activities. *NLRB v. Gogin*, 575 F.2d 596 (7th Cir. 1978). In determining the effect of an employer's interrogation on an employee, the court should consider, *inter alia* : (1) the background of the employer-employee relationship; (2) the questioner's identity; (3) the nature of the information sought; (4) the place and method of the interrogation; and (5) the truthfulness of the reply. *First Lakewood Association v. NLRB*, 582 F.2d 416 (7th Cir. 1978).

 The Board based its finding of coercive interrogation on three separate incidents: the questioning by Bailey of Anna Caldwell on December 7, and the two episodes of Reece questioning Acres on December 15. On this petition and before the Board, the Company did not object to the Board's finding and conclusion that Reece's questioning of Acres constituted coercive interrogation in violation of § 8(a)(1). Once again, review in this court is precluded by 29 U.S.C. § 160(e) and that portion of the Board's order not contested is summarily enforced. *NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691 (7th Cir. 1976).

The Company's only objection to the Board's findings of coercive interrogation relates to the interrogation of Anna Caldwell. The Company asserts that the questioning of Caldwell was not coercive and that the Board's inference that the questioning related to union activities was purely speculative.

 We do not agree with either contention. The record demonstrates the presence of factors which fully justify the Board's finding of coercive interrogation in relation to union activities. Caldwell's reference to the union showed that she viewed the interrogation as related to union activities. As the Board's opinion noted, the interrogation occurred only one day after the search of Birt's locker, and one day before the union organizational meeting. The questions revolved around Caldwell's conversation with Acres, a leader of the organizational movement. The Company has never advanced any legitimate reason for the inquiry. From this evidence, the Board could justifiably infer that the questioning was for the purpose of obtaining information on union activities.

Regarding the coerciveness of the questioning, the questioning was conducted by Bailey, the plant manager, in his office and of an employee in a position with which he would ordinarily have no direct contact. After Caldwell's initial response, he pressured her to tell him what she and Acres had "really" been discussing. Under these circumstances, there was substantial evidence on the record as a whole for the Board to find that the questioning of Anna Caldwell was coercive interrogation in relation to union activities.

### E. Surveillance of Union Activities

 An employer violates § 8(a)(1) when it conveys to employees the impression that it is engaged in surveillance of their union activities. *First Lakewood Association v. NLRB*, 582 F.2d 416 (7th Cir. 1978). The Board's findings of surveillance were based on the locker search on December 5, the interrogation of Anna Caldwell on December 6, Miller's statement to Birt on December 8 that the Company knew about the union meeting the evening before, and Reece's conversation with Acres on December 15 in which he stated that he knew Acres and Birt were the union leaders.

For the reasons stated in the Board's opinion and previously in this opinion, we agree that Caldwell's interrogation conveyed to her a sense of surveillance of union activities and thus violated § 8(a)(1). As to the statements of Miller and Reece, we see no exceptional circumstances for overturning the Board's credibility determination that these statements were in fact made. The Company, nevertheless, urges that none of these statements was sufficient to convey a sense of surveillance. Taking into consideration our limited scope of review, we must disagree. Miller's statement that the Company knew about the union meeting could create an impression of surveillance in that there was no showing how Miller knew about the meeting or whether it was general knowledge. Similarly, Reece's claim that he knew who the union leaders were could convey an impression of surveillance. Although our decision on Reece's and Miller's statements might have been different from that of the Board had our review been *de novo*, the Board's findings of improper surveillance based on these incidents is enforceable as supported by substantial evidence.

The Company voiced two objections to the Board's finding that the locker search violated § 8(a)(1). It argued that the search was not union-related because it was necessitated by narcotics and alcohol problems and because it had occurred prior to the union organizational meeting. The administrative law judge expressly discredited the vague testimony of alcohol and drug problems, and we see no reason to overturn that determination. The Company's argument that the search could not be union related because it occurred prior to the meeting is frivolous. The Company clearly knew of Birt's union involvement prior to the actual meeting. For the reasons stated in the Board's opinion, therefore, there was substantial evidence demonstrating that the object of the search was a union-related document. Therefore, we find that there was substantial evidence for each of the Board's findings of improper surveillance.

## F. The Christmas Bonus

The Board concluded that the "change to cash above the value of previous gifts during a union campaign, and at a time Respondent apparently was in difficult financial circumstances, without reasonable explanation thereof and in the context of other efforts to discourage union activity, persuades us that the Respondent was utilizing the occasion to impress on its employees that it was the source of benefits to them and gave them the cash bonus as an inducement to abandon union support." An employer violates § 8(a)(1) by conferring a benefit upon his employees to induce them to abandon union activity. *NLRB v. Exchange Parts, Inc.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); *NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691 (7th Cir. 1976). The determination of whether the granting of benefits stems from unlawful economic motives or is intended to discourage employee interest in organization is the kind of inference which is primarily for the Board. *NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691 (7th Cir. 1976). The question on this review is not whether we would have interpreted the employer's intention as did the Board in the first instance but whether the Board's resolution of this factual issue is supported by substantial evidence on the record as a whole. *Universal Camera v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

We cannot say that substantial evidence does not support the finding that the bonus was intended to induce employees to abandon the union. In finding an unlawful purpose, the Board may properly rely on such factors as the employer's knowledge of union activity, manifestations of anti-union animus, suspicious timing, and departures from past practice. *Russel Newman Manufacturing Co. v. NLRB*, 407 F.2d 247, 252 (5th Cir. 1969). There was evidence of each of these factors to demonstrate anti-union motivation. The Company's primary contention against enforcement is that there could be no disparate value and thus benefit between the Christmas bonus and past gifts

because no cash value was assigned to prior gifts. It was certainly a reasonable inference from the evidence, and within the competence of the Board, to conclude that a bonus of $50.00 would exceed the value of a gift of fruit or a gift of a ham or a turkey. Although we think this issue is a close one, our limited scope of review requires us to uphold the Board's decision.

## III. THE § 8(a)(3) VIOLATIONS

### A. The Discharges of Birt and Acres

 Section 8(a)(3) provides that it shall be an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * * *." 29 U.S.C. § 158(a)(3) (1976). The crucial determination behind the finding of a § 8(a)(3) violation must be that the employer's discharge or layoff of employees was discriminatorily motivated. NLRB v. Gogin, 575 F.2d 596 (7th Cir. 1978); Electri-Flex Co. v. NLRB, 570 F.2d 1327 (7th Cir.), cert. denied, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978). Motivation is a question of fact to be determined by the Board from consideration of all the evidence and in making this determination the Board is free to rely on circumstantial, as well as direct evidence. NLRB v. Gogin, 575 F.2d 596 (7th Cir. 1978); W. W. Grainger, Inc. v. NLRB, 582 F.2d 1118 (7th Cir. 1978).

 The Board concluded that Birt and Acres were discharged for their union activities and that the alleged slowdown was merely a pretext for the discriminatory discharges. The facts upon which the Board relied are set forth in detail in the opinion and need not be repeated at length here. The Board properly relied on evidence in the record of manifest hostility toward unionization combined with knowledge of the discharged employees' union activity, NLRB v. Tom Wood Pontiac, Inc., 447 F.2d 383 (7th Cir. 1971); coincidence in time between the employees' union activity and their discharges, Borek Motor Sales, Inc. v. NLRB, 425 F.2d 677 (7th Cir.), cert. denied, 400 U.S. 823, 91 S.Ct. 45, 27 L.Ed.2d 52 (1970), the employees' good work records, NLRB v. Henry Colder, 416 F.2d 750 (7th Cir. 1969), and implausible or shifting explanations for the employees' discharges, Satra Belarus, Inc. v. NLRB, 568 F.2d 545 (7th Cir. 1978). Of these factors, the last mentioned was the one most compellingly demonstrated by the evidence. No reason was given to Birt and Acres for the layoffs at the time. They were told they were being laid off for "lack of work" although they had work to do. The Company's contention that this reason was given so that Birt and Acres could draw unemployment was belied by the Company's initial attempt to defeat their claims for unemployment compensation. More importantly, a purported explanation for the admittedly false reason for the discharges fails to answer the question of the actual motivation for the discharges.

The first time that any potentially non-discriminatory reason for the discharges was advanced by the Company was in the hearing before the administrative law judge. The reason advanced at that time was the purported slowdown conducted by Birt and Acres. Reece admitted he knew of this purported slowdown several months prior to December 8, and his explanation that he wanted to correct the problem through management is highly unconvincing in light of the lack of evidence from Miller or Bailey that any management action was actually taken by them as Reece contended. The administrative law judge explicitly discredited Reece's testimony on this point and there is no reason for overturning that determination.

Also, regardless of the legal status of the Company's representation,[6] the Company's refusal to comply with the terms of the settlement reinforces the Board's findings of illegal motivation. The Company claims that, although the slowdown was the cause for the discharge at the time it was made, it entered into a settlement not knowing it was a valid defense to the charges and withdrew when it found that it was a defense. It is inconceivable to this court, as it apparently was to the Board, that the Company believed if an employee, in fact, was discharged for an intentional slowdown, the

6. The parties devoted much of their argument to defining the nature of the Company's representation during the settlement proceedings. The Company contends it had no "legal counsel" until the hearing before the trial examiner. The Board, on the other hand, states that the

Company had a "legal representative" from the time the charge was filed with the NLRB. We note only that the Company did have a "legal representative" from the time the charge was filed with the NLRB in the sense that it had permissibly designated someone to represent it

intentional slowdown could not be valid grounds for dismissal. We must agree with the Board's interpretation of the evidence as demonstrating the Company's belated discovery of a hoped-for defense to the charges it was facing.

None of the evidence of this alleged slowdown serves to diminish the substantial evidence of discriminatory motivation behind the discharges or to support Reece's credibility as to his motivation. The testimony of the core room employees that cores were backed up in October and November cannot in and of itself establish that Birt and Acres were engaged in an intentional slowdown. Nor is there any evidence that any of these employees reported their observations to management personnel. Similarly, evidence that an employee with less experience than Birt and Acres had better production records in February and March of 1979 can, at best, be corroborative of other independent evidence of a slowdown. Such evidence of production in 1979 records is inconclusive in light of the many variables in production, most notably the several changes in production methods for the months in question.

The Company's only direct evidence of the alleged slowdown were the gross sales figures for the final months of 1978 and Birt's scrap records for December. Noticeably, the Company does not point to anything in Acres' production records which showed any slowdown on his part. The significance of Birt's scrap records can be dismissed in that Reece admitted Birt's scrap records had "not much" to do with the decision to discharge him. From the records of gross sales, the figures show that the Company had relatively high sales and thus production in October and November, the two months of the purported slowdown. The lower sales in December are, at best, inconclusive, as they are also attributable to the closing of the foundry for Christmas and the closing of two production lines as a result of the discharges.

The only remaining items of evidence of the slowdown which merit discussion are the various threats supposedly made to oth-

er employees by Birt and Acres of a slowdown. Needless to say, evidence of threats of a slowdown is not tantamount to evidence of a slowdown having taken place. There is no evidence that these threats were conveyed to management prior to the discharges nor did Reece testify that he relied on these threats in making his decision. Yet, even if Birt and Acres did engage in a slowdown, Reece admitted that he believed all the molders participated in the slowdown. Reece's shifting justifications for the selection of Birt and Acres, the union organizational leaders, for discharge failed to convince the administrative law judge of Reece's credibility on this point, and we ultimately see no reason to overturn that determination. Our conclusion is reinforced by the undisputed fact that Reece offered Acres his former job if he would abandon the union.

■ For these reasons, we conclude that there was substantial evidence on the record as a whole for the Board's findings that the discharges of Birt and Acres were discriminatorily motivated and that the slowdown was merely an after-acquired pretext to obfuscate the actual anti-union motivation for the discharges.

### B. The Supervisory Status of Birt and Acres

Alternatively, the Company claims that Birt and Acres were supervisors excluded from the protections of the Act. Supervisors are excluded from the Act's coverage by 29 U.S.C. § 152(3) (1976). Section 2(11) of the Act defines a supervisor as:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

throughout the proceedings. The precise nature of the representative's expertise is not before this court and is irrelevant to our determination in that we do not believe that the assistance of an attorney was necessary for the Company to realize that an employee could be lawfully discharged for an intentional refusal to

work if that were, in fact, the cause of the discharge. Moreover, the Company's objection to Acres' and Birt's applications for employment benefits based on their "poor performance" indicates that the Company was aware that a slowdown could be just cause for discharge.

**628**

29 U.S.C. § 152(11) (1976). We sustain the Board's conclusion that Birt and Acres were not supervisors within the meaning of the Act.

The Company premises its assertion of Birt's and Acres' supervisory status on their "responsibility to direct" other employees. The evidence that Birt and Acres occasionally gave assistance to less experienced molders in a routine and limited manner does not rise to the level of supervisory responsibility. *See NLRB v. Houston Natural Gas Corp.*, 478 F.2d 467 (5th Cir.), *cert. denied*, 414 U.S. 1067, 94 S.Ct. 575, 38 L.Ed.2d 472 (1973); *C & W Super Markets, Inc. v. NLRB*, 581 F.2d 618 (7th Cir. 1978).

C. The Discharges of Schumacher and Elder

It is agreed by the parties that the discharges of Birt and Acres cut off production on the molding lines to which Elder and Schumacher were assigned. As a result, Schumacher and Elder were temporarily laid off for lack of work until the Company was able to renew production on the molding lines. The administrative law judge concluded that Elder and Schumacher were laid off in violation of §§ 8(a)(1) and (3) because their layoffs were "part and parcel of Respondent's discriminatory acts."

Although the ostensible reason for Schumacher's and Elder's layoffs was lack of work, the direct proximate cause of the layoffs was the Company's unlawful discharges of Birt and Acres for their union activity. If it had not been for the unlawful discharges of Birt and Acres, Elder and Schumacher would not have been laid off. The two molding production lines were set up with Birt on one line and Acres on the other as molders. Elder and Schumacher's sole responsibility was to assist Birt and Acres in pouring the molds and shaking the molded pieces out of the mold. Thus, it was directly foreseeable that there would be no work for Elder and Schumacher at least temporarily if Birt and Acres were discharged.

■ The present issue of the Company's liability for Schumacher's and Elder's layoffs can best be analogized to the issue of liability when innocent employees are laid off in mass with employees discharged for their union activities. In those cases, it is well established that a showing that the Company discharged each employee for union activities is not necessary for finding §§ 8(a)(1) and (3) violations if the cause of the discharges is anti-union activities. *Dillingham Marine & Manufacturing Co. v. NLRB*, 610 F.2d 319 (5th Cir. 1980); *Merchants Truck Line, Inc. v. NLRB*, 577 F.2d 1011 (5th Cir. 1978); *Majestic Molded Products, Inc. v. NLRB*, 330 F.2d 603 (2d Cir. 1964); *NLRB v. Tesoro Petroleum Corp.*, 431 F.2d 95 (9th Cir. 1970); *M. S. P. Industries, Inc. v. NLRB*, 568 F.2d 166 (10th Cir. 1977).

■ Our holding on this very issue is a very limited one. Only when, as here, a directly foreseeable layoff would not have occurred but for the unlawfully discriminatory action, can the resultant layoff also constitute a violation of §§ 8(a)(1) and (3).

■ For the foregoing reasons, we conclude that the Board's findings and conclusions in their entirety were supported by substantial evidence on the record as a whole. Accordingly, the decision and order of the Board is

Enforced.