**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The INDUSTRIAL ERECTORS, INC., Respondent.**

No. 82–2294.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1983.

Decided July 13, 1983.

William Bernstein, Elliott Moore, N.L.R.B., Washington, D.C., for petitioner.

Herbert M. Berman, Chicago, Ill., for respondent.

Before PELL and POSNER, Circuit Judges, and JAMESON, Senior District Judge.*

PELL, Circuit Judge.

In this application for enforcement of an order by the National Labor Relations Board (NLRB or the Board), respondent The Industrial Erectors, Inc. (the company) contests the Board's finding that the company violated sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) (the Act), by various actions it took in response to a union organization effort. The company contends that the Board erred in finding that the company unlawfully threatened to withhold wages and benefits because of the union's presence at the company. The company also con-

* William J. Jameson, Senior District Judge for the District of Montana, sitting by designation.

tends that it had a legitimate, nondiscriminatory business reason for laying off eight employees a week after the union began its drive.

## I. FACTS

The company is an Illinois corporation that manufactures, repairs, and installs material-handling equipment such as cranes and hoists. The company also sells products made by other companies. This case involves the company's machine shop, which manufactures the hoists and cranes and which had fourteen employees at the time of the first contested layoff. The equipment manufactured in the shop is marketed under the name of Industrial Crane & Equipment Co., a wholly owned subsidiary of The Industrial Erectors, Inc.

On May 7, 1980, the International Brotherhood of General Workers (the union) began an organizing drive in the machine shop. Employees Medina and Randle signed union authorization cards that day and employee Karolak signed one the following day when employee Bonafe offered him one. Cleotha Ryan, another employee, also signed one.

On May 8, the union filed a petition seeking representation of the employees. That day, the personnel manager of the company, Roger Petroff, called Medina into his office and questioned him about his union contacts. Medina denied that he had any contacts and signed a statement stating that he had nothing to do with the union. Petroff also questioned Karolak about his union contacts. Karolak denied that he had signed a union authorization card and, when requested, signed a statement that he had not heard anything about the union.

On May 9, Medina told Petroff that he had signed a union card. Petroff asked him to tell Gerald Cole, the president of the company, what he had said. When Medina told Cole that he had signed a card, Medina testified that Cole responded: "How could you do this to me after all we have done for you?" When Medina said that he wanted hospitalization and retirement plans, Cole replied: "Over my dead body." Also on May 9, plant manager Ron Roberts held an employees' meeting, at which he told them that business was slow but that no one would be laid off.

Over the weekend of May 10, the company hired a consulting firm to help it defeat the union's organization efforts. On May 12, following the advice of the firm, the company posted a notice that read:

> This company cannot improve working conditions, give unscheduled raises or grant new and additional benefits now that the company has received notification (as of 5–12–80) of the intention of the International Brotherhood of General Workers to unionize the employees of The Industrial Erectors, Inc.
>
> /s/Leonard Birch [Vice-President]

The company took down the sign after a few days because it was told by some unidentified person that it had been ill-advised to put the sign up. Also on May 12, the day that the company received the union's petition, the management called an employees' meeting. Petroff reportedly told the employees that "everything was frozen," including raises, because the union had formally notified the company of its attempt to organize.

At some time between March and May 14, Petroff prepared a list of shop employees who might be laid off. He ranked the fourteen workers in the order in which he thought they should be laid off. Between May 7 and May 14, Roberts prepared a list on which he designated employees as "union," "nonunion," or "?". The company contends that it made the decision to lay off the employees before Roberts presented the management with his list, and that it followed the Petroff list.

On May 14, the company laid off employees Cazares, Karolak, Randle, Rice, and Ryan. Of the five, Randle and Ryan were listed as "union" on Roberts's list, while Karolak and Rice were designated as "?". Cazares was not on the list. Employee Dirl, who never was laid off, testified that shortly before the 14th he overheard Roberts say to an unidentified person in the men's room,

"I can't believe they did that when they had already told me that we were not going to lay anyone off." After the layoffs were announced, when Ryan went to speak with Roberts and protested that he should not have been laid off because he did not have many union contacts, Roberts replied that "the crew made the bed so they have to lay in it."

Cole testified that the employees were laid off because of a business slump. As to why the particular five were dismissed, he said that Cazares was the last man hired; Karolak had minimal skills; Randle was a poor worker; Rice was trained in only one skill; and Ryan, whom he described as an excellent worker, was performing a job that others could do.

Then, on June 6, the company laid off employees Stichnoth, Bonafe, and Vander. On Roberts's list, Stichnoth and Bonafe were listed as "union," while Vander was listed as "?". Cole testified that Bonafe was laid off because, as an electrician, he had run out of work, and the other two were laid off because the machine shop was shut down.

All of the employees except Randle were recalled by August 29: Karolak on May 18, Vander on June 16, Stichnoth on June 23, Rice on July 7, Bonafe on July 8, Ryan on July 23, and Cazares on August 29. The union election was held on August 6. Two employees voted in favor of the union and eight against.

On May 16 and June 9, 1980, the union filed charges against the company with the NLRB. On June 18, 1980, the Board issued a complaint against the company alleging violations of sections 8(a)(1) and (3) of the Act. A three-day hearing was held before an Administrative Law Judge (the ALJ), who issued his decision on October 23, 1981. The judge concluded that company officials had unlawfully interrogated employees about their union sympathies, had unlawfully threatened to withhold wage increases and benefits, and had unlawfully laid off the eight employees. The ALJ rejected the company's proffered business motive for the layoffs, concluding that it was pretextual.

The Board affirmed the ruling of the ALJ on May 14, 1982. 261 N.L.R.B. No. 125, 1981–82 NLRB Dec. (CCH) ¶ 18,989 (May 14, 1982). The Board ordered the company to cease and desist from its unlawful labor practices, to make whole the employees for lost wages and benefits for the period of their layoffs, and to rehire employee Randle, the one worker not recalled.

## II. THE INTERROGATIONS

We deal initially with the Board's finding that the company violated section 8(a)(1) of the Act by unlawfully interrogating employees about their union sympathies. Although the company does not contest the Board's ruling on this issue, and thus the holding is entitled to summary affirmance, *NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 624 (7th Cir.1981), the relevance of the cited activity to the issue of the lawfulness of the layoffs leads us to discuss the Board's holding at greater length.

An employer's interrogation of employees concerning their union contacts is unlawful only if the questions asked, when viewed as the employee must have understood them, could reasonably coerce or intimidate the employee with respect to union activities. *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 689 (7th Cir. 1982); *NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 624 (7th Cir.1981). The Board held that the actions of personnel manager Petroff, in calling employees Medina and Karolak into his office, asking them about their union contacts, and requesting that they sign statements denying knowledge of the union, violated the Act.

We are persuaded that there was substantial evidence to support the Board's finding. The questioning took place during working hours in the office of an important company officer. The questioning occurred a day after the union began to organize; and the company asserted no legitimate reason for the questioning or the requests to sign statements denying any knowledge

of the union. All of these factors are relevant and important in determining whether there was unlawful questioning. *NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d at 624; *accord, NLRB v. Otis Hospital,* 545 F.2d 252, 256 (1st Cir.1976).

## III. THREATS TO WITHHOLD WAGE INCREASES AND BENEFITS

On May 12, 1980, the company posted a notice directed to its employees that stated that the company would give no unscheduled raises or grant new or additional benefits because of the union's organizing drive. In addition, personnel manager Petroff told employees at a meeting that "everything was frozen," including raises, because the union had contacted the company. The ALJ held that this notice and Petroff's remark violated section 8(a)(1) of the Act because they suggested that the cause of the freeze of raises and benefits was the union. The company contends that this holding was in error because the company merely was fulfilling its legal requirements and was seeking to avoid the appearance of bribing its employees by offering new benefits in response to the union's petition.[1]

■ It is a violation of section 8(a)(1) for an employer either to grant a benefit with the purpose of interfering with the employees' right to organize, *NLRB v. Exchange Parts Co.,* 375 U.S. 405, 409, 84 S.Ct. 457, 459, 11 L.Ed.2d 435 (1964), or to withhold established wages or benefits for the same purpose, *NLRB v. Lucy Ellen Candy Division of F & F Laboratories, Inc.,* 517 F.2d 551, 554 (7th Cir.1975). The company suggests that it would be put in an unfair position if, in seeking to comply with the former rule, it ran afoul of the latter.

■ Contrary to the company's suggestion, an employer is not put in a "damned if you do, damned if you don't" position by the rules governing the granting or withholding of new benefits. "[N]either [granting nor withholding benefits] has been de-

clared illegal *per se.* It becomes so only if the employer is found to be manipulating benefits in order to influence his employees' decision during the union's organizing campaign." *NLRB v. Otis Hospital,* 545 F.2d 252, 255 (1st Cir.1976). A company is supposed to act as though the union were not present. *Great Atlantic & Pacific Tea Co.,* 166 N.L.R.B. 27, 29 n. 1 (1967). The ALJ and the Board held that the company did not do so here.

There have been numerous cases involving similar company announcements in response to a union's organizing effort. In *NLRB v. Porta Systems Corp.,* 625 F.2d 399, 402 (2d Cir.1980), the company's chief executive officer reportedly said that there would be no wage increases "because of the union being on the scene." The court affirmed the Board's finding that this remark violated section 8(a)(1).

Similarly, in *Sta-Hi Division, Sun Chemical Corp. v. NLRB,* 560 F.2d 470, 473–74 (1st Cir.1977), the vice-president of personnel of the company stated that because there was a union petition, "we could go no further" in implementing a plan to increase wages. The court held that this statement was a violation because it suggested that the decision not to increase wages was due to the petition. *Accord, NLRB v. Travis Meat & Seafood Co.,* 653 F.2d 233, 235 (6th Cir.1980) (inappropriate for a company to tell employees that "[c]ompanies are not free to give wages or other benefits as long as unions are on the scene"); *NLRB v. Otis Hospital,* 545 F.2d 252, 256 (1st Cir.1976) (inappropriate for hospital administrator to state that he did not know if he could give raises because "the union was around"); *NLRB v. Tamper, Inc.,* 522 F.2d 781, 785 (4th Cir.1975) (improper for a company manager to state that "we can't do anything right now [about wage adjustments] until this mess is over with but just as soon as it [is] over with, [we] can issue the new classifications").

The company asserts that the notice in effect stated that the management would

1. The company does not contest the Board's holding that it was no defense to contend that

it had relied upon advice of the consultant hired to fight the union's drive.

not try to bribe employees to vote against the union. The notice did not even suggest that this was its purpose, nor do we believe that an employee was likely to interpret it in this manner. If the company intended to tell employees that it was freezing unscheduled raises and benefits in order not to give the appearance of trying to influence the unionizing effort, it could have so stated. Petroff's statement to the employees the same day also said nothing about wanting to avoid the appearance of influencing the election. All of this supports the Board's conclusion that the implied message of the notice was that the union was responsible for the freeze.

The company also contends that the notice referred only to a freeze on unscheduled raises and new and additional benefits, rather than regular, scheduled raises. As the Board noted, however, the reference to unscheduled raises is meaningless because the company had no scheduled raises. The sole method for raising wages, the record indicates, was a merit review for each employee every six months, a procedure that involved no set figure for the amount of a raise an employee would receive. In addition, Petroff's remark that "everything was frozen" contained no such limitation.

Accordingly, we hold that there was substantial evidence to support the Board's holding that the company violated the Act by threatening to withhold increases in wages and benefits.

## IV. THE LAYOFFS

### A. Burdens of Proof

The ALJ found that the company laid off the eight employees because of their union activities and thereby violated section 8(a)(3) of the Act. The judge concluded that the rule of analysis in "mixed motive" cases involving alleged unlawful discharge, set forth in *Wright Line, A Division of Wright Line, Inc.,* 251 N.L.R.B. 1083, 1089 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), did not apply because the sole motive for the layoffs was antiunion animus. The Board affirmed the

finding of a violation but disavowed the ALJ's decision not to apply the *Wright Line* analysis. The Board nevertheless held that the ALJ's failure expressly to rely on *Wright Line* was not error because his analysis satisfied the analytical objectives of that case.

In *Wright Line,* the Board formulated a standard of analysis in mixed-motive discharge cases. The Board held that the General Counsel has the initial burden of making a prima facie showing sufficient to support the inference that the employer's opposition to protected conduct was a motivating factor in the employer's decision to discharge. Once that showing is made, the burden shifts to the employer to show that it would have taken the same action even in the absence of the protected activity. 251 N.L.R.B. at 1089.

The Supreme Court recently upheld the Board's *Wright Line* analysis. *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). The Court overturned the First Circuit's holding that only the burden of production, not persuasion, shifted to the company once the prima facie case was made. The Supreme Court's decision has the effect of overruling the cases in this circuit that reached the same result as the First Circuit, *e.g., NLRB v. Webb Ford, Inc.,* 689 F.2d 733, 739 (7th Cir.1982).

The *Transportation Management* decision thus renders moot the dispute in the instant case over whether the Board applied the proper *Wright Line* analysis. Furthermore, we are persuaded that the Board correctly held that the ALJ's analysis conformed to the *Wright Line* analysis: once the General Counsel made a prima facie case, the company attempted to meet its burden of persuasion by contending that the layoffs were imposed for business reasons, but the ALJ held that these were not the real reasons for the layoffs.

### B. Discussion

■ Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), provides that it is an unfair labor practice for an employer to encourage

or discourage membership in a labor organization "by discrimination in regard to hire or tenure of employment or any term or condition of employment." The General Counsel must show that an antiunion motivation contributed to the discharge or layoff. In determining the factual issue of motivation, the Board may consider both direct and circumstantial evidence. *NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 626 (7th Cir.1981).

■ Among the factors the Board may consider in determining whether there were discriminatory discharges are a record of manifest hostility toward unionization, combined with knowledge of the discharged employees' union activity; coincidence in time between the employees' union activity and their discharges; good work records of the discharged employees; and implausible or shifting explanations for the discharges. *Id.; accord, NLRB v. Town & Country LP Gas Service Co.*, 687 F.2d 187, 192 (7th Cir.1982). The Board found that all of these factors were present.

■ The evidence is largely undisputed that the company was actively hostile toward the union's organization efforts. Prior to the layoffs, the company's personnel manager interrogated two employees about their union sympathies and asked them to sign statements to the effect that they knew nothing about the union. In one instance, an employee was called into the president's office to discuss his union sympathies. As discussed above, the Board properly held that this questioning was itself a violation of the Act.

A few days later, the company hired a consulting firm to help it fight the union, which it was entitled to do, but it followed the consultant's advice to post an unlawful notice to employees stating that, because of the union's organizing drive, raises and benefits would be frozen. In addition, the plant manager told one laid-off employee who objected that he had not been active in the union drive that "the crew made the bed so they have to lay in it."

The company challenges the significance of the last remark, asserting that it is ambiguous because the "bed" the crew made might have been poor workmanship or low productivity. In the context in which the remark was made, however, it was not ambiguous because it was in response to the employee's complaint that he had not been active in the union.

There also is undisputed evidence that the company was aware of the employees' union activity at the time of the layoffs. Personnel manager Petroff, a high-level company officer who took an active part in the decision to lay off employees, questioned employees whom he suspected of having prounion sympathies. Plant manager Roberts, who took part in at least some of the management meetings considering layoffs, drew up a list of employees whom he designated "union," "nonunion," or "?".

Although the company does not deny that it knew of the employees' union activities at the time of the layoffs, it asserts that it had decided to lay off the employees prior to May 7, when the union's organizing drive began. The company contends that the management followed a list of employees prepared by Petroff prior to May 7 that suggested an order for the layoffs. The company further states that the list drawn up by Roberts was submitted to the management after the decision to lay off the employees was made, and thus that list played no part in the decision to lay off employees.

We are persuaded that there was substantial evidence to support the Board's conclusion that the decision to lay off employees was made in response to the union's drive and was not made prior to May 7.

First, the testimony of Gerald Cole, the president of Industrial Erectors, contradicts the company's contention that the final decision to lay off the employees was made before the union began its organizing effort. Cole testified that Roberts presented his list the morning after a late-night meeting at which the management reached its decision to lay off employees. Roberts's list, containing notations about employees'

union sympathies, was made after the 7th, and thus the meeting to which Cole refers took place, at the earliest, on the night of the 7th.

Second, there is other evidence to support the conclusion that the decision to lay off the employees was made after the union's drive began. Cole and Petroff testified that Roberts was present at least at some of the discussions about layoffs that they said were held before May 7, although he was not present at the one when the final decision was made. From those meetings and in his position as plant manager he would have been expected to have heard well before May 14 that the company had decided to lay off employees, if the decision in fact was made before May 7. Yet the evidence shows that he learned of the layoffs only shortly before the 14th. On May 9, he assured the employees that there would be no layoffs. Then, just before the first layoff, an employee overheard him tell someone in the washroom that he was surprised by the layoffs after having been told that there would be none.

Third, the employees actually laid off and the order of the layoffs differ substantially from the recommendations on Petroff's list, which the company asserts was the list that it followed. For example, Bonafe was listed as "union" on Roberts's list, but was not assigned a rank on Petroff's list because Petroff thought that he was immune from being laid off as the sole electrician. Nevertheless, he was laid off. Vander, listed as a "?", was laid off despite being listed as ninth on Petroff's list. Dirl, listed as a "?", was not laid off despite being listed as fifth.

By contrast, those laid off closely corresponded to the designations of "union," "nonunion," and "?" on Roberts's list. All four of the employees listed as "union" were laid off. Three of the six employees marked "?" were laid off. *None* of the three marked "nonunion" were laid off. The significant deviations from Petroff's list and the close correlations to Roberts's

list suggest it was the latter list (or similar information that other company officers had) that the company followed.

Fourth, Roberts's failure to designate employee Medina as "union" on his list (he was designated as "?") and the company's failure to lay off Medina does not mean that the list was a "will-of-the-whisp [sic] ... probative of nothing," as the company contends. The purpose of laying off employees for their union sympathies is to scare or intimidate them and other employees into opposing the union. The evidence suggests that by May 9 Medina already was intimidated or had been persuaded to change his mind. When Petroff first questioned him about his union contacts, Medina denied having any, but the next day he admitted having signed a union authorization card. He even spoke to the company's president about his reasons for supporting the union. There was arguably little point, after that, in laying him off. Roberts's designation of Medina as a "?" is in accord with this because, after his confession to Petroff and Cole, his union sympathies were uncertain.[2]

Even accepting Cole's testimony that Roberts did not give his list to the company management until after the final decision to lay off the employees, there is plenty of other evidence of antiunion motivation. The primary importance of Roberts's list is its demonstration of the company's concern about the effect the union's drive was having on employees. As noted, Roberts was not the only company officer who had information about the employees' union sympathies. Petroff, who was intimately involved in the decision to lay off employees, took an active role in discerning which employees supported the union, even more active than Roberts took.

The Board also was persuaded that the close proximity between the employees' unionizing efforts and the layoffs was an indicium of antiunion motivation. The first layoff, constituting about 30% of the shop employees, came two days after the company received the union's election petition, a

---

**2.** The Board expressly disavowed the ALJ's holding that Medina was apparently immune

from being laid off because he was the company's only truck driver.

document that indicated that the union had at least 30% employee support. The company's response to this is that, because the decision to lay off employees was made before May 7, there was no correlation. Because, as noted, even the company's evidence supports the conclusion that the decision was made after May 7, the Board was entitled to infer antiunion motivation from the close coincidence in time.

█ In order to meet its burden of showing that it would have taken the same action in the absence of the union's presence, the company contends that it laid off employees for economic reasons unrelated to the unionizing effort. The Board rejected the company's contention, holding that economic considerations were not the reasons the company actually had for laying off the employees. We hold that there is substantial evidence to support the Board's conclusion that the company's economic justification is pretextual.

The company first cites a sharp decline in orders for cranes in the period April to June 1980. The chart below represents a monthly breakdown of crane orders: [3]

| | | | |
|---|---|---|---|
| October 1979: | $29,000 | March 1980: | $45,000 |
| November 1979: | 9,000 | April 1980: | 18,000[4] |
| December 1979: | 17,000 | May 1980: | 12,000 |
| January 1980: | 11,000 | June 1980: | 20,000 |
| February 1980: | 35,000 | July 1980: | 18,000 |

Shop orders did drop off in the period April through June, but the sales were considerably stronger than in the fall period when no such large layoffs occurred. Furthermore, the two months preceding the decline, February and March, showed excellent sales. The Board held that the inconsistent responses to the two periods of decline—laying off no one during the earlier, sharper decline, and laying off more than 50% of the employees during a milder decline when the union was trying to organize—undercut

the company's contention that the layoffs were due to business reasons.

The company contends that the decline in sales from April to June was alarming because "orders might [have been] expected to increase because of summer construction demands." This contention is implausible, however, because the president of the company testified that there is usually a delay of three or four months from the time of the order to delivery. A builder seeking to obtain a crane for summer construction would therefore want to order one in February and March to be sure to get one for the summer. The high sales for February and March appear to show that this is what happened.

The company's next contention is that the Board erred in considering only the shop's financial condition rather than the economic health of the entire company. The company says that fiscal 1979, ending on September 30, 1979, was one of the best years in the company's history, while fiscal 1980 saw the company's revenues drop 18%. The company contends that it was entirely reasonable for it not to have laid off shop employees in the fall, despite the slump in shop orders, because the company as a whole was doing well. Similarly, it was just as reasonable for the company to have laid off employees in the spring when the company was doing less well, even though the shop's sales were better than they had been in the fall and, in fact, were excellent in February and March.

Although in some situations it might be appropriate to consider the economic health of the entire company in determining whether a layoff was necessary, the evidence is strong that this economic argument is an after-the-fact attempt to justify the layoffs. First, all but one of the employees were recalled within a short time, yet there is no evidence of a significant upturn in business when the rehirings oc-

---

**3.** The figures listed represent income attributable to the orders placed in those months. Buyers in fact paid only upon delivery, often months later. The figures have been rounded off to the nearest $1,000.

**4.** The company cited a figure of $14,000 for April in its brief, but the Board in its brief correctly notes that this is inaccurate. Apparently the company neglected to include income attributable to three April orders that were shipped in July and August.

curred.[5] Second, *only* shop employees were laid off, not employees from other divisions of the company when those divisions were the primary ones losing money. We find it unlikely that the company would try to help its finances by laying off shop employees when the shop was doing moderately well, and not laying them off when it was doing poorly. It would be bizarre behavior indeed for the company to deal with losses attributable to other divisions by virtually crippling a comparatively strong division. In short, the Board was justified in rejecting the company's various economic justifications for the layoffs.

Finally, with the exception of employee Lester Randle, there is no dispute that the employees had good work records. The company's own reasons for the layoffs were such factors as being trained to perform only a limited number of skills (Karolak and Rice), being the last hired (Cazares), redundancy of position despite excellent work (Ryan), and the closing down of the sections in which the employees worked (Bonafe, Stichnoth, and Vander). The good work records of the employees thus support an inference of discriminatory motivation.

As for Randle, however, there is considerable evidence that he was not a good worker. He himself testified that Petroff and Roberts had complained about his work before the union began its drive, and that Roberts had threatened to fire him. He also testified that he had admitted to Petroff that his work was not "topflight." In sum, the Board might well have found, on balance, that the company had proved that Randle was discharged because of his incompetence.

Nevertheless, there is substantial evidence to support the Board's conclusion that Randle was fired for impermissible reasons.

There is no doubt that the General Counsel made a prima facie showing that antiunion animus was a motivating factor in the discharge. In view of the evidence that the company knew of Randle's union sympathies—he had signed a union authorization card and was listed as "union" on Roberts's list—and because Randle was one of seven other employees discharged because of the company's antiunion attitude, we cannot say that the Board erred in holding that the company failed to prove that it would have discharged Randle anyway. At most the evidence suggests that the company did not *recall* him because of his poor workmanship.

### CONCLUSION

For the foregoing reasons, we grant the Board's petition for enforcement of its order in its entirety.

---

5. Citing *Hasbro Industries, Inc.,* 254 N.L.R.B. 587 (1981), the company asserts that it is "well-settled Board law ... that fast reinstatement of laid off employees vitiates a finding that the layoffs were unlawful." *Hasbro* said no such thing. In that case, an employee testified at a Board hearing while laid off. The company recalled him two weeks later, but laid him off again after two months. He contended that he had been discharged the second time because of his testimony.

The Board held in favor of the company on the grounds that it had followed its practice of laying off employees in the order of seniority and that the intermediate recall indicated that the company did not lay him off the second time in response to his testimony. Thus *Hasbro* involved a totally dissimilar set of facts (a recall *before* the layoff) and did not lay down the broad rule that the company contends it did.