**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DOROTHY SHAMROCK COAL COMPANY, Respondent.**

No. 86–2862.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 2, 1987.

Decided Nov. 25, 1987.

---

**17.** Dr. Heller is not entitled to punitive damages in light of our holding and reasoning in this opinion.

Fred Cornnell, NLRB, Washington, D.C., for petitioner.

David L. Swider, Sommer & Barnard, Indianapolis, Ind., for respondent.

Before BAUER, Chief Judge, and FLAUM and EASTERBROOK, Circuit Judges.

BAUER, Chief Judge.

Dorothy Shamrock Coal Company (the "Company") sells and distributes coal in Indianapolis, Indiana. The Company challenges the National Labor Relations Board's (NLRB) findings that it violated sections 8(a)(1) and (3) of the National Labor Relations Act ("Act"), 29 U.S.C. § 151, et seq., by discouraging efforts to unionize its truck drivers and subsequently terminating all of its drivers following an unsuccessful union election.

The Company employs all nonunion drivers to operate its trucks. In 1981, however, Local 716 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (the "Union") initiated efforts to organize the truck drivers. Approximately seven weeks after a representation election, that the Union lost, the Company's president and owner, Frank Carr, ordered the termination of all employee drivers, replacing them with independent truckers and trucking firms. Subsequently, the discharged employees filed a charge with the NLRB alleging that the terminations were taken in retaliation for unionization efforts. Administrative

Law Judge John West found that the Company "threatened its employees with closure or elimination of their jobs and informed an employee that it would be futile to select a union to represent employees" thereby engaging in unfair labor practices in violation of section 8(a)(1) of the Act. The ALJ also determined that the Company violated section 8(a)(3) by terminating its employees in retaliation for unionization efforts. Finally, the ALJ held that the Company violated sections 8(a)(1) and (4) of the Act by "informing its employees that it would not discuss reinstitution of its operations or any other matters because a charge had been filed with the Board, and by failing and refusing to recall or reinstate its employees...." A three member panel of the NLRB affirmed the ALJ's rulings that the Company violated sections 8(a)(1) and (3), but reversed the finding of a section 8(a)(4) violation. We hereby enforce the judgment of the NLRB.

## I.

This action presents a close case of factual inferences and credibility determinations while raising few if any legal issues. The Board argues that statements made by Company supervisors evidence antiunion animus and its retaliatory intent in discharging its employees. The Company proffers innocent explanations for the allegedly discriminatory comments and argues that economic pressures necessitated its actions. Our task is to determine if the judgment of the NLRB is supported by substantial evidence on the record as whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *see, e.g., Kankakee–Iroquois County Employers' Ass'n. v. N.L.R.B.*, 825 F.2d 1091, 1094 (7th Cir.1987); *N.L.R.B. v. American Printers and Lithographers*, 820 F.2d 878, 884 (7th Cir. 1987). We must defer to the expertise of the Board and will not displace its reasonable inferences even where a plenary review of the record might yield a different result. *NLRB v. United Insurance Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962). Moreover, we "must accept the Board's credibility findings unless the party challenging [those determinations] establishes [that] 'exceptional circumstances'" justify a different result. *NLRB v. Del Rey Tortilleria, Inc.*, 787 F.2d 1118 (7th Cir.1986) (quoting *NLRB v. Harrison Steel Castings Co.*, 728 F.2d 831, 836 n. 9 (7th Cir.1984)); *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 687 (7th Cir.1982).

## II.

The Board found that statements made by Ben Henry, division manager of the Company, and William Scruggs, its truck supervisor and dispatcher, violated section 8(a)(1) of the Act.[1] In late February or early March, 1982, a Company truck driver, Jack Wilson, asked William Scruggs for time off since Wilson was "out of hours," a colloquialism for working more than the usual number of hours. Scruggs responded: "Sounds to me like you're trying to run this like a union shop." Henry, who also was present during this exchange, added that "we're not union, we never have been, and never will be." Before driving for Shamrock, Wilson worked as a union driver for another company, a fact well known both to Scruggs and Henry.[2] Subsequent-

1. Section 7 of the National Labor Relations Act guarantees employees "the right to self-organization, to form, join or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. 157. Section 8(a)(1) makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7." 29 U.S.C. 158(a)(1). Section 8(a)(3) makes it an unfair labor practice for an employer to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." 29 U.S.C. 158(a)(3).

2. In June, 1981, Jack Wilson inquired about a truck driving position. During the course of an interview with Henry, Wilson was asked if his current position was unionized, to which he responded that it was. Henry then replied that driving for Shamrock "is not a union job, we've never been union, ... and never will be." Wilson was subsequently hired in November, 1981. Although this incident is not alleged to be a

ly, Wilson contacted the Teamsters Union in an attempt to organize the Company's drivers.

 The Company argues that the statements made to Wilson reflect only the managers' opinions and cannot be characterized as threats against unionization.[3] The tenor and circumstances of the remarks, however, do not support such a contention. Unlike many of the cases cited by the Company, Henry's clear and unequivocal statement to Wilson that "we're not union, we have never been and never will be" was definitely not a "casual" comment made within the free flow of conversation between workers and supervisors. *See, e.g., Gossen Co. v. NLRB,* 719 F.2d 1354 (7th Cir.1983). That uncompromising retort met Wilson when he inquired about taking some time off because he worked overtime and was accused of "trying to run this like a union shop." Nor was this the isolated sentiment of a single supervisor couched in terms of personal opinion. Both Scruggs and Henry were in clear agreement that the Company would never tolerate union organization. Moreover, Henry made the identical remark nine months earlier during Wilson's job interview.[4] These comments were a calculated attempt to discourage employee organization and thus violated section 8(a)(1) of the Act. *See Fred Lewis Carpets, Inc.,* 260 NLRB 843, 846–49 (1982) (employer unlawfully told employees that he was not "going to go union"); *but cf. NLRB v. Larry Faul Oldsmobile Co.,* 316 F.2d 595 (7th Cir.1963) (statement that employer "might as well throw business up for grabbs" after successful union election was not a threat, but merely an expression of exasperation).

Following his encounter with Henry and Scruggs, Wilson became dissatisfied with his working conditions and discussed unionization with other drivers. Wilson contacted the Teamsters Union in April, 1982, which eventually filed an election petition with the NLRB following a successful authorization-card drive. On June 11, the Union lost an NLRB election by a 5–2 margin. The NLRB certified the election results on June 21, 1982. On July 30, 1982, the Company's President, Frank Carr, released a communique 'to the drivers announcing their immediate termination. The drivers were told that the decision was motivated by their failure to properly complete new driver forms instituted to reduce expenses. The drivers were assembled again on August 2 and read another letter prepared by Carr. This letter attributed Carr's decision to the drivers' failure to follow instructions, a thirty-four percent increase in insurance rates, and a "consistency [sic] of mechanical and other increases." The ALJ found that the General Counsel established a prima facie case that the Company's decision was in retaliation for its employees' recent pro-union activities, and rejected the Company's economic justifications for the terminations as unsupported by the record. The NLRB adopted the ALJ's recommended order which we now enforce.

### III.

The General Counsel carries the burden of proving the elements of a section 8 unfair labor practice. *See* 29 CFR § 101.10(b) (1982). Thus, the Counsel must establish that the discharge or other adverse labor practice was "based in whole or in part on antiunion animus—or ... that the employee's protected conduct was a substantial or motivating factor in the [employer's] adverse action." *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 401–03, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667 (1983). The employer, however, may avoid liability by showing that his actions would have been the same "regardless of his forbidden motive." *Wright Line,* 251 N.L.R.B. 1083 (1980), enf'd., 662

---

separate unfair labor practice, it is relevant in judging the impact and motive of Henry's later comments. *See J.P. Stevens & Co. v. NLRB,* 461 F.2d 490, 493–94 (4th Cir.1972).

**3.** Section 8(c) of the Act states that "[t]he expressing of any views, arguments, or opinion

... shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefit."

**4.** *See* note 2 *supra.*

F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

The Company contends that the General Counsel failed to establish a prima facie case of a section 8(a)(3) violation because there is no direct evidence that Frank Carr harbored antiunion animus and no evidence linking Carr with the statements of Scruggs and Henry. The Company also argues that even if such a prima facie case could be made, the record contains substantial evidence of business justification for the terminations, contrary to the ALJ's determination. We deal with each of these arguments in turn.

▮▮▮▮ The Board relied upon a variety of factors in determining that Shamrock was motivated by a retaliatory antiunion animus in terminating its truck drivers. We believe that determination is supported by substantial evidence in the record. The Company, through two of its supervisory personnel, articulated, on several occasions, its strong antiunion stance and its commitment to retain a nonunion workforce. The Company contends that these statements cannot be attributed to Carr and therefore are not indicative of an antiunion motive in his decision to terminate the drivers. The Board, however, is "free to rely on circumstantial as well as direct evidence" in assessing motive. *NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613, 626 (7th Cir. 1981), *see also NLRB v. Rain–Ware, Inc.,* 732 F.2d 1349, 1352–54 (7th Cir.1984) (where the president of a small company made the layoff decision, but had made no unlawful statements and had often been absent from the facility, a local manager was found to be either "speaking directly for management or ... relating his knowledge of the [president's] position" in threatening a retaliatory plant closure).

On several occasions Supervisor Scruggs explicitly attributed the Company's antiunion policy directly to Frank Carr. On one occasion Scruggs told employee Sharp that there "won't be any union in here," that "Frank [Carr] wouldn't allow a union in the shop," and that Carr "would close up before he had a union shop." Wilson also testified that he overheard Scruggs tell an independent truck driver that "[b]efore Frank Carr would allow a Union to get in here, he'd shut the gate." Despite Scruggs's contention that Carr never expressed hostility toward unionization, the ALJ properly exercised his discretion and discredited those conclusory denials. *See NLRB v. Thor Power Tool Co.,* 351 F.2d 584, 587 (7th Cir.1965) (no obligation to accept employer explanations if it is reasonable to believe it "furnished the excuse rather than the reason for [an employer's] retaliatory action"). The Company presents no evidence justifying the disturbance of this credibility determination.

The Company argues also that because many of the threats cited by the Board were contingent upon a successful union election, they are not indicative of its motive to terminate the drivers because the union lost the election. That contention fails for several reasons. The short answer is that the comments initially made by Scruggs and Henry to Wilson regarding the Company's intention never to become unionized were not made in contemplation of any election. Thus, those comments demonstrate a "manifest hostility" toward union activity and are relevant in determining the Company's motive for its conduct. *See NLRB v. Industrial Erectors, Inc.,* 712 F.2d 1131, 1137 (7th Cir.1983); *Rich's Precision Foundry, Inc.,* 667 F.2d at 626. Moreover, the ALJ credited and the Board affirmed a finding that Scruggs made a postelection comment to employees Wilson and Sharp that he "was still concerned ... about his pension" and was still concerned "that Frank might close [the facility] down, or that the arrangements had already been made for Dorothy Shamrock to go strictly owner-operator," thereby evidencing the Company's intent to eliminate union activists from its ranks despite the union's recent defeat. Despite the union's loss, it is entirely logical that the Company would attempt to purge its workforce of pro-union influences in order to preserve its avowed policy never to employ union drivers.

The close proximity of the union election and the decision to convert to independent

drivers also serves as evidence of the Company's motive. *See NLRB v. Rain–Ware, Inc.*, 732 F.2d at 1353; *NLRB v. Industrial Erectors, Inc.*, 712 F.2d at 1137; *see also Borek Motor Sales, Inc. v. NLRB*, 425 F.2d 677, 681, (7th Cir.) *cert. denied*, 400 U.S. 823, 91 S.Ct. 45, 27 L.Ed.2d 52 (1970) ("The timing of the [adverse action] also supports the inference that [it took place] in order to make good the threat. . . ."). As the Petitioners noted, "not only did Scruggs make numerous threats that the Company would convert to owner-operators just before the election, he also warned just three weeks later that the Company was still contemplating a retaliatory conversion to owner-operators. By the end of the month the Company had done just that." Thus, there is substantial evidence in the record upon which the Board could properly conclude that the Company was motivated by a continuing antiunion animus in terminating its employees. *See, e.g., Behring International, Inc.*, 252 NLRB 354 (1980) (employer who engaged in unfair labor practice before unsuccessful union election later illegally terminated employees and subcontracted their work); *Dash v. NLRB*, 793 F.2d 1062 (9th Cir.1986) (union activist unlawfully discharged six months after unsuccessful union election).

Additionally, the Company's shifting justifications for the terminations severely undermines its credibility on this appeal. *See Rich's Precision Foundry, Inc.*, 667 F.2d at 626 (shifting explanations constitute relevant and even compelling evidence of unlawful motive); *Rain–Ware, Inc.*, 732 F.2d at 1354. The Company initially informed its drivers that they were being terminated for failure to properly complete driver forms intended to control costs. At the hearing before the ALJ, however, it did not contend that employee error motivated its actions. Indeed, the Company admitted that only two employees failed to properly complete the forms due primarily to a lack of proper instructions by Company supervisors. The Company's brief does not refute the NLRB's findings in this regard. More-over, although the hearing transcript (Tr. 11) clearly indicates that the Company's attorney, Donald Smith, argued that Carr's decision was based in part on a "loss of business" and a "substantial reduction in sales," [5] the Company contends on this appeal that it "never attributed the layoff decision to declining sales." The Company does not attempt to explain this obvious inconsistency, much less refute the Board's well founded conclusion that its claim of decreased sales is unsupported by the record.

## IV.

■ We turn now to the Board's determination that the Company failed to establish that the terminations would have occurred notwithstanding its drivers' organizational activities. The Company maintains that it was forced to terminate its employee truck drivers to cope with economic pressures and thus would have taken the same action regardless of its forbidden motive. *See NLRB v. Transportation Management Corp.*, 462 U.S. at 401–03, 103 S.Ct. at 2474–75; *see also Midwest Stock Exchange, Inc. v. NLRB*, 635 F.2d 1255, 1265 (7th Cir.1980) ("Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a)(3) forbids"). The Board, however, rejected the Company's economic justifications as unsupported by the record. As noted earlier, the Company's initial explanation of employee misconduct was discredited by its own testimony and abandoned on this appeal. The Company's position regarding decreasing sales also has been dropped.

In addition, we find ample support for the Board's rejection of the contentions pursued on this appeal. We need not pass long on the Company's suggestion that a letter from the Interstate Commerce Com-

---

**5.** In its brief to the Board, the Company also stated that Carr relied on a "decreasing volume of business" and indicated that the Company's business volume had "plummeted" between January and July of 1982.

mission ("ICC") prompted Carr's decision to release the drivers. There is substantial evidence in the record to support the Board's conclusion that the ICC's inquiry challenged the use of leased and owner-operated vehicles for the interstate transportation of coal, and therefore, could hardly prompt the discontinuation of company-owned transportation in favor of independent drivers.

The Company also cites an increase in the cost of insuring its vehicles as justification for the terminations. Although a letter introduced at the hearing tends to indicate that the Company was facing an insurance increase, no documentary evidence was ever submitted establishing the size of the increase. Nor did the Company ever introduce documentation establishing the actual cancellation of insurance covering its trucks. The Company informed its employees that it had received notice of a thirty-four percent increase in insurance cost, but suspiciously failed to introduce a copy of that notice at the hearing. The record supplies ample justification for rejecting the Company's contention. Shamrock's failure to produce relevant evidence particularly within its control allowed the Board to draw an adverse inference that such evidence would not be favorable to it. *See UAW v. NLRB*, 459 F.2d 1329, 1336 (D.C.Cir.1972); *NLRB v. Treasure Lake, Inc. v. NLRB*, 453 F.2d 202, 204 (3d Cir. 1971). Moreover, as the ALJ noted, the Company did not attempt to sell its vehicles, thereby eliminating its self-professed insurance crisis. Instead, the Company upgraded and repaired its trucks with the apparent expectation of future use, thus regenerating the very need for insurance that Shamrock claims forced it to remove company-owned vehicles initially. The Board, therefore, could properly conclude that increasing insurance costs did not justify the Company's conduct, particularly in light of its avowed antiunion stance. *See Borek Motor Sales, Inc.*, 425 F.2d at 680.

Finally, we consider the Company's contention that its actions were justified by rising repair and maintenance costs. The Company maintains that it expended $37,459.00 from January to June of 1982 for the repair and maintenance of its ten trucks. It merely doubles that figure thus estimating its annual cost at $74,918.00; a figure substantially larger than previous annual expenses. The simple doubling of semiannual expenditures, however, is a bold extrapolation unsupported by the Company's cost history. Indeed, as the Petitioner shows, comparable expenses from January to June of 1981 totaled $36,095.00 or only $1,364 less than the same period in 1982. Furthermore, the total annual expenditure in 1981 was only $54,683.00, thus casting significant doubt on the Company's unsupported contention that costs would double in 1982. Our examination of the cost figures employed by the Company compared with those presented by the Petitioner convince us that rising repair costs could not justify the Company's actions.

For the foregoing reasons the judgment of the National Labor Relations Board is

ENFORCED.