875 F.2d 644
 131 L.R.R.M. (BNA) 2561, 111 Lab.Cas. P 11,211
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America-UAW, Intervenor,
v.
JAKEL MOTORS, INC., Jakel Manufacturing Company, Inc., and
Jakel Incorporated, Single Employer, Respondent.
 No. 88-2380.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 16, 1989.
Decided May 26, 1989.
As Corrected May 30, 1989.
 
 Richard Cohen, N.L.R.B., Washington, D.C., for petitioner.
 Robin Wellford, Suelthaus & Kaplan, P.C., St. Louis, Mo., for respondent.
 Before CUMMINGS, and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 FLAUM, Circuit Judge.
 
 
 1
 This is a petition for enforcement of an order of the National Labor Relations Board ("NLRB" or "Board"). Respondent Jakel Motors, Inc. ("Jakel") challenges the Board's finding that the company violated section 8(a)(3) of the National Labor Relations Act (the "Act"), 29 U.S.C. Sec. 158(a)(3), with respect to the discharges, transfers, and/or failures to recall twelve employees. Upon reviewing the administrative law judge's ("ALJ") comprehensive findings of fact, which were adopted by the Board, and considering the parties' briefs and oral arguments, we find Jakel's arguments to be without merit and, accordingly, grant the petition for enforcement.
 
 I.
 
 2
 Jakel is an Illinois corporation engaged in the manufacture and sale of small electric motors with production facilities in Highland, Illinois, and Palestine, Illinois. The company is family-owned and run primarily by several of the Jakel brothers. During March 1985, Jakel employees began a union organizing effort which culminated in a Board election held on October 4, 1985. Jakel's flagrant anti-union response to this organizing effort resulted in an NLRB finding of more than thirty violations of section 8(a)(1) of the Act. The violations included coercive interrogation of employees; threatening employees with plant closures, discharges, retaliatory transfers of work, loss of jobs, less desirable work assignments, and unfavorable employment references; telling employees that they or certain named co-workers had been discharged because they were pro-union; telling employees that their union activities were futile because the company would never negotiate or sign a contract with the union; engaging in surveillance of union meetings; prohibiting employees from distributing union literature on company property; and promulgating an overly broad no-solicitation/no-distribution rule. Jakel does not contest these findings, and we summarily affirm the section 8(a)(1) violations. NLRB v. Industrial Erectors, 712 F.2d 1131, 1134 (7th Cir.1983).
 
 
 3
 In addition, the Board found that Jakel had violated section 8(a)(3) of the Act with respect to twelve employees. It is the section 8(a)(3) violations that Jakel challenges, asserting that the Board's finding, as to each employee, is not supported by substantial evidence. Jakel raises no legal issues, nor does it contest any of the Board's underlying findings of fact. Jackel merely challenges the inferences drawn by the Board from those facts and contests the credibility findings of the ALJ.
 
 II.
 
 4
 The legal framework for review of an NLRB decision was aptly stated by this court in NLRB v. Dorothy Shamrock Coal Co., 833 F.2d 1263 (7th Cir.1987):
 
 
 5
 Our task is to determine if the judgment of the NLRB is supported by substantial evidence on the record as [a] whole. We must defer to the expertise of the Board and will not displace its reasonable inferences even where a plenary review of the record might yield a different result. Moreover, we "must accept the Board's credibility findings unless the party challenging [those determinations] establishes [that] 'exceptional circumstances' " justify a different result.
 
 
 6
 Id. at 1265 (citations omitted). The Shamrock court also stated the burdens of proof for a section 8 violation and commented on the types of evidence on which the Board may rely:
 
 
 7
 The General Counsel carries the burden of proving the elements of a section 8 unfair labor practice. Thus, the Counsel must establish that the discharge or other adverse labor practice was "based in whole or in part on antiunion animus--or ... that the employee's protected conduct was a substantial or motivating factor in the [employer's] adverse action." The employer, however, may avoid liability by showing that his actions would have been the same "regardless of his forbidden motive."
 
 
 8
 * * *
 
 
 9
 * * *
 
 
 10
 The Board, however, is "free to rely on circumstantial as well as direct evidence" in assessing motive.
 
 
 11
 * * *
 
 
 12
 * * *
 
 
 13
 [The timing of the adverse action] also serves as evidence of the Company's motive.
 
 
 14
 Id. at 1266, 1267, 1267-68 (citations omitted).
 
 
 15
 As to each employee, Jakel denies that anti-union animus was a motivating factor in its decision and contends that each adverse employee action was taken for non-discriminatory reasons. We initially note that Jakel's denial of any anti-union animus is belied by the uncontested findings of the Board that Jakel committed numerous, flagrant, and widespread acts of interference, restraint, and coercion in violation of section 8(a)(1). With respect to Jakel's claim that despite any purported anti-union animus, the adverse employee actions were motivated by non-discriminatory reasons, we will briefly summarize the main points of evidence supporting the Board's findings.
 
 
 16
 Transfers and Discharges of Theresa Buzick, Cynthia
 
 Strowmatt and Claralea Beckering
 
 17
 Theresa Buzick initiated the organizational effort at Jakel's Highland plant. In March 1985, she contacted the union headquarters, and an organizing meeting was set for June 12. Buzick, Strowmatt and Beckering all attended and signed authorization cards at that meeting. Daniel Jakel and another Jakel official conducted unlawful surveillance of the meeting.[1] Within one week of the meeting, Daniel Jakel transferred Buzick, Strowmatt and Beckering to Jakel's Palestine facility, 150 miles away. At the time, the Palestine plant was closed and had been closed for about a month; no production work was being done at the plant. The three women, all production line employees, were made to do janitorial cleanup work. In order to document the conditions at Palestine, the three transferees took pictures of themselves at the plant. One evening, they also taped a conversation with a laid-off Palestine employee concerning conditions at the plant. Within one week of their transfers to Palestine, the three were discharged. Jakel contended that they were discharged for taping supervisors' conversations and for taking unauthorized pictures. Jakel's contention is without merit. No evidence was introduced to show that any supervisors' conversations were taped, and picture-taking was not a prohibited activity. Substantial evidence in the record supports the Board's finding that the transfers and discharges were discriminatory in violation of section 8(a)(3).
 
 Discharge of Jo Ann Pryor
 
 18
 Pryor did not attend the June 12 meeting. However, on June 13, a Wednesday, she was unlawfully interrogated by a Jakel supervisor about whether she had attended the meeting and whether she was for the union.[2] Pryor told the supervisor that she was for the union, and during the next few days Pryor talked to several other employees, encouraging them to support the union. On Friday, June 14, Pryor was looking at the efficiency reports for one of the plant's departments in order to get a list of employee names for organizing purposes. While so engaged, Daniel Jakel came by and instructed the department leadman not to let Pryor look at the reports. In the past, employees, including Pryor, had been allowed to look at the reports without interference by management. On the next workday, Monday, June 17, Robert Jakel, president of the company, delivered an anti-union speech to his assembled employees, during which he stated that the union would do them no good and could only cause a loss of jobs and that the company would never negotiate or sign a contract with the union. On that same day, Daniel Jakel called Pryor to his office and discharged her. Jakel contends that Pryor was discharged for her poor attitude and use of foul language (evidence of which is contained in the record). However, we find that substantial evidence in the record--including the timing of the discharge, the unlawful interrogation of Pryor a few days prior to the discharge, the unprecedented interference with her looking at efficiency reports, and the fact that her two work evaluations had shown satisfactory performance--supports the Board's finding of unlawful discrimination.
 
 Discharge of Sabra Rench
 
 19
 Each Jakel production employee was rated for efficiency on a weekly basis. If an employee's efficiency rating fell below the acceptable standard, that employee was ordinarily given a warning and a period of time to improve. Rench's efficiency ratings during April and May, 1985, fell below standard. On about May 31, Daniel Jakel called Rench to his office and explained to her that they wanted to keep her but that she would have to improve her efficiency ratings. The ALJ credited Rench's testimony that Jakel gave her a 3-month probationary period to get her efficiency rating up to standard. Rench attended the June 12 union meeting which, as noted, had been unlawfully monitored by Daniel Jakel. On June 17, the same day that Robert Jakel delivered his anti-union speech and Daniel Jakel transferred Strowmatt and Beckering to the Palestine plant[3] and discharged Pryor, Daniel Jakel precipitously fired Rench. At the time of her discharge--less than three weeks after she had been promised a 3-month probationary period-Rench had already succeeded in raising her efficiency rating to above-standard. Accordingly, the Board's finding with respect to the discharge of Rench is supported by substantial evidence.
 
 
 20
 Failure to Recall Vivian Cox, Janet Franklin, and Diana Hauger
 
 
 21
 On June 21, in anticipation of reopening the Palestine plant, Jakel conducted interviews of laid-off employees who desired to return to work. Cox, Franklin and Hauger were among those employees who had been retained until the day or week that the plant had been closed. All three had above-standard efficiency ratings, had no disciplinary records or warnings, were sufficiently versatile to work in various positions, and had specific notations in their files recommending them for reemployment. During their rehire interviews, the three were unlawfully interrogated about their union sentiments,[4] and all made what could be considered pro-union statements. The three were not rehired, even though Jakel hired new employees and rehired several former employees who had disciplinary records and warnings and who had been identified as not recommended for reemployment. The ALJ found Jakel's rationale for refusing to recall these three employees to be a pretext. The Jakel interviewer claimed that Cox had been "nervous" during her interview, that since Franklin's husband was in Indiana she was probably "transient," and that Hauger's personal appearance was unappealing. On the record as a whole, there is substantial evidence to support the Board's finding that Jakel's proffered explanations were pretextual.
 
 
 22
 Discharges of Elizabeth Nye and Deborah Westbrook
 
 
 23
 Nye and Westbrook were active union supporters who had worn union buttons on a daily basis, had attended union meetings, had distributed union literature to employees, and had solicited employees to sign authorization cards. In addition, Nye had co-authored and signed a letter published in a local newspaper detailing the company's treatment of employees Buzick, Strowmatt and Beckering. Company President Robert Jakel later characterized the letter as the "Norma Rae" letter. Both employees had consistently high efficiency ratings and neither had ever been disciplined or warned. In fact, Nye had been designated "Quality Employee of the Month" in January 1985. On July 2, Nye and Westbrook were suddenly discharged. Jakel offered no explanation for the firings to either the ALJ or to this court. In its brief on appeal, Jakel merely argues that the company did not know of their union activities. The argument is without merit.
 
 Discharge of Rodney O'Brien
 
 24
 Like Nye and Westbrook, O'Brien was a very active and visible union supporter. In an employee evaluation dated April 25, O'Brien had received high ratings in every category. He had never been disciplined nor received any warnings or reprimands of any kind. On June 27 and again on July 1, a Jakel manager warned O'Brien to be careful because the company was looking for a reason to fire him. Thereafter, a series of eight memos citing a decline in O'Brien's work found their way into his personnel file. On July 23, he was discharged. The ALJ found both the circumstances and the content of the eight memos to be suspect, and we agree. Substantial evidence on the record as a whole supports the Board's finding with respect to O'Brien.
 
 Transfer of Clyde Hentz
 
 25
 On September 24, Hentz attended a union meeting. On October 3, Daniel Jakel called Hentz to his office and demanded to know how Hentz intended to vote in the union election and threatened him with replacement if he did not vote for the company.[5] On October 4, election day, Hentz wore a union button to work. On October 7, Hentz was transferred from the position of leadman to production work repairing motors. Jakel offers one line of argument in its brief in defense of this discriminatory transfer, contending that the transfer was not discriminatory because Hentz's pay was not reduced. The argument is without merit.
 
 III.
 
 26
 For the reasons stated herein, the judgment of the National Labor Relations Board is ENFORCED.
 
 
 
 [1]
 The unlawful surveillance formed the basis for one of the section 8(a)(1) violations
 
 
 [2]
 This interrogation formed the basis for another of the section 8(a)(1) violations
 
 
 [3]
 Buzick was not at work on the 17th, so she was not informed of her transfer until the next day, June 18
 
 
 [4]
 These interrogations were found to violate section 8(a)(1)
 
 
 [5]
 The interrogation and threat were found by the Board to violate section 8(a)(1)