THE COUNTY OF MENARD, Petitioner, v. ILLINOIS STATE LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District No. 4—90—0024

Opinion filed September 27, 1990.—Rehearing denied October 29, 1990.

Carol Pope, State's Attorney, of Petersburg, and Andrew A. Peterson and Timothy D. Speedy, both of Jackson, Lewis, Schnitzler & Krupman, of White Plains, New York, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert Ruiz, Solicitor General, and William D. Frazier, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois State Labor Relations Board.

Gilbert Feldman, of Cornfield & Feldman, of Chicago, for respondent American Federation of State, County, and Municipal Employees.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

Respondent County of Menard (County) challenges the decision of the Illinois State Labor Relations Board (ISLRB or Labor Board) (*County of Menard*, 6 Pub. Employee Rep. (Ill.) par. 2006, No. S—CA—87—46 (Illinois State Labor Relations Board, Dec. 11, 1989)) finding the County violated sections 10(a)(1) and 10(a)(2) of the Illinois Public Labor Relations Act (Act) (Ill. Rev. Stat. 1985, ch. 48, pars. 1610(a)(1), (a)(2)) by discharging Donald Witherell, a maintenance employee at the County's Sunny Acres Nursing Home (nursing home). The County's previous appeal in this case challenged the September 23, 1987, decision of the Labor Board, which found the County had violated section 10(a)(2) of the Act by discharging Witherell. In *County of Menard v. Illinois State Labor Relations Board* (1988), 177 Ill. App. 3d 139, 531 N.E.2d 1080, we reversed and remanded the cause to the Labor Board for application of the *Wright Line* test to the facts found below. The County now contends: (1) it was prejudicial error for the Labor Board not to consider evidence presented at the supplemental hearing; and (2) the County met its burden under the *Wright Line* test and the Labor Board's decision was against the manifest weight of the evidence. We affirm.

PROCEDURAL BACKGROUND

On August 21, 1986, Witherell was dismissed from his position at the nursing home by the Menard County Board (County Board), which has the exclusive authority to hire and fire employees. On September 5, 1986, the American Federation of State, County, and Municipal Employees (AFSCME or union) filed charges with the Labor Board alleging Witherell was discharged due to his union activity. The Labor Board's Executive Director issued a complaint December 24, 1986, alleging violations of sections 10(a)(1) and (a)(2) of the Act. Hearings followed and the hearing officer issued a recommended decision March 24, 1987. (*County of Menard*, 3 Pub. Employee Rep. (Ill.) par. 2043, No. S—CA—87—46 (Illinois State Labor Relations Board, June 1, 1987 (Hearing Officer's decision of March 24, 1987, appended)).) The hearing officer concluded since the County Board, which had the exclusive authority to hire and fire employees, possessed no antiunion motivation, Witherell was not unlawfully fired. The Labor Board adopted the hearing officer's factual findings but reversed his conclusions of law. The cause was remanded to the hearing officer to determine whether the nursing home's administrator, Warren Dick, possessed illegal motivation in bringing the charges against Witherell, which resulted in Witherell's termination by the County Board. See *County of Menard*, 3 Pub. Employee Rep. (Ill.) par. 2043, No. S—CA—87—46 (Illinois State Labor Relations Board, June 1, 1987).

The hearing officer issued a supplemental recommended decision and order July 8, 1987, finding Dick was motivated by antiunion hostility and the discharge was based on Witherell's protected activity, resulting in violations of the Act. (*County of Menard*, 3 Pub. Employee Rep. (Ill.) par. 2058, No. S—CA—87—46 (Illinois State Labor Relations Board, Sept. 23, 1987 (Hearing Officer's supplemental decision of July 8, 1987, appended)).) The Labor Board adopted the hearing officer's supplemental decision on September 23, 1987; however, the Labor Board found that several findings of antiunion hostility made by the hearing officer in the supplemental decision were not supported by the record. The Labor Board concluded enough evidence of antiunion motivation existed in the record, however, to support the hearing officer's conclusion. See *County of Menard*, 3 Pub. Employee Rep. (Ill.) par. 2058, No. S—CA—87—46 (Illinois State Labor Relations Board, Sept. 23, 1987).

Pursuant to the County's petition for review, we reversed and remanded, instructing the Labor Board to apply the test set forth in *Wright Line, a Division of Wright Line, Inc.* (1980), 251 N.L.R.B. 1083, 105 L.R.R.M. 1169, instead of the test in *State of Illinois (De-*

*partments of Central Management Services & Corrections*), 1 Pub. Employee Rep. (Ill.) par. 2020, No. S—CA—54 (Illinois State Labor Relations Board, Sept. 13, 1985), which the Labor Board had previously applied. In our opinion, we stated "we reverse and remand this cause to the ISLRB for application of the *Wright Line* test to the facts found below." *Menard*, 177 Ill. App. 3d at 152, 531 N.E.2d at 1089.

On October 20, 1989, the Labor Board issued an order determining it was necessary to conduct a supplemental hearing in this matter. The matter was assigned to another hearing officer, who found the court opinion unclear as to whether the case needed to be reopened for further evidence. The hearing officer scheduled a supplemental hearing and instructed the parties they would be afforded the opportunity to present further evidence. The parties would be allowed to argue the admissibility of the evidence received in their briefs. The hearing officer stated he would make a decision regarding the admissibility of the evidence in his recommendation to the Labor Board. On March 17, 1989, AFSCME petitioned the appellate court to clarify the terms of the remand. This motion was denied on March 27, 1989.

A supplemental hearing was held on April 25, 1989. At this hearing, Warren Dick and Pamela S. Behrans testified for the County. On August 17, 1989, the hearing officer issued his recommended decision and order. (*County of Menard*, 6 Pub. Employee Rep. (Ill.) par. 2006, No. S—CA—87—46 (Illinois State Labor Relations Board, Dec. 11, 1989 (Hearing Officer's decision pursuant to appellate remand of Aug. 17, 1989, appended)).) The hearing officer adopted the factual findings of the Labor Board's September 23, 1987, decision (*County of Menard*, 3 Pub. Employee Rep. (Ill.) par. 2058, No. S—CA—87—46 (Illinois State Labor Relations Board, Sept. 23, 1987)) and recommended the evidence offered during the supplemental hearing not be considered in the disposition. He cited the absence of such a direction in the court's previous decision. The hearing officer concluded the County had met its burden under the *Wright Line* test and, accordingly, he recommended the complaint be dismissed. On December 11, 1989, the Labor Board issued its supplemental decision and order in which it adopted the hearing officer's findings of fact and his conclusion rejecting the supplemental evidence. However, the Labor Board rejected the hearing officer's conclusion of law and found, under the *Wright Line* test, the County had violated sections 10(a)(1) and 10(a)(2) of the Act. The County has now appealed this ruling, arguing (1) the ISLRB erred in not considering the remand; (2) the ISLRB did not comply with the order on remand, and its decision is not supported by the

record; and (3) the County met its burden under *Wright Line*, so the ISLRB's finding the employee's discharge constituted an unfair labor practice should be reversed.

ANALYSIS

■ With respect to the first issue, the Labor Board did not err in excluding the evidence offered at the supplemental hearing. It is generally held when a reviewing court remands a cause with specific directions, they must be followed exactly; but if specific directions are not given, the trial court (or, as here, the administrative agency) is required to examine the appellate court's opinion and determine from it what further proceedings would be proper and consistent with the opinion. *John Burns Construction Co. v. Interlake, Inc.* (1984), 125 Ill. App. 3d 26, 465 N.E.2d 639.

■ Our previous opinion stated: "[w]e reverse and remand this cause to the ISLRB for application of the *Wright Line* test *to the facts found below.*" (Emphasis added.) (*Menard,* 177 Ill. App. 3d at 152, 531 N.E.2d at 1089.) The plain meaning of this statement does not require the admission of additional evidence and does provide clear, specific directions for remand. The *Wright Line* test is such that there was no need for additional evidence.

With respect to the remaining issues raised by the County, we have considered the facts as found by the hearing officer(s) and the ISLRB. Witherell started working for the County in 1971. From 1971 until April 1980, Witherell worked in the County's highway department. From April 1980 until August 21, 1986, Witherell worked at the nursing home. When Witherell started at the nursing home, he was given the job title of maintenance director. Warren Dick was hired in February 1982, as the nursing home administrator. As administrator, Dick was responsible for the overall financial state of the nursing home, all personnel matters at the home, and for ensuring the nursing home complied with regulations.

Witherell was on call 24 hours a day and was frequently called into the nursing home during his scheduled time off. Because the nursing home paid no overtime, Witherell was permitted to take off compensation time for every hour of overtime he worked. Witherell performed his work with little or no supervision and generally ensured the physical and mechanical problems of the nursing home were overcome. Dick admittedly recognized this fact and, in 1983, named Witherell "Employee of the Month." Witherell was subsequently elected "Employee of the Year" by the nursing home staff.

The first notable conflict between Dick and Witherell occurred on

October 1, 1985, when Dick told Witherell he was going to have to start punching in and out on a time clock. This initial conflict preceded union activity at the nursing home. Dick had evaluated employees in light of the requirements of *Garcia v. San Antonio Metropolitan Transit Authority* (1985), 469 U.S. 528, 83 L. Ed. 2d 1016, 105 S. Ct. 1005, and determined Witherell was not exempt under the Fair Labor Standards Act of 1988 (29 U.S.C. §201 *et seq.* (1988)) so had to be paid overtime. To effectuate this, Witherell was required to punch the time clock.

On October 3, 1985, Witherell tore up his time card and refused to punch in. On October 7, 1985, Witherell was issued a new time card, but again refused to use it. On October 8, 1985, Dick called Witherell into his office to issue him a written warning for failure to use the time clock. Witherell asked whether Dick would fire him if he failed to use the time clock. Dick said that he might. Witherell said he did not mind using the time clock, but thought he was being discriminated against because it was not required of other supervisors. Witherell then complained to Dick that he had not been consulted about a repairman's visit that day to repair a dishwasher. Dick told Witherell it was not necessary to consult Witherell before he called a repairman. Witherell then told Dick he was going home sick because he was too nervous to work. He told Dick he was going to call some people. Dick's secretary, Mary Raikes, witnessed this conversation, took shorthand notes, and transcribed the conversation. This was done pursuant to Dick's request as, he testified, he had earlier been involved in an employment discrimination suit and as a result of that he now has the practice of making someone witness and transcribe "important conversations."

The union began organizing the employees of the nursing home in October 1985. In October or November 1985 a group of employees met with Dick to discuss the union. The employees and Dick discussed pay raises and charges of employment harassment. The employees said they wanted to settle this matter without bringing in the union. Dick said there were no problems on the other two shifts and the troublemakers were all on the day shift. Dick said he thought bringing in the union was a personal vendetta against him. Dick never mentioned any names, but used the masculine pronoun when referring to the person with the vendetta against him. All employees at the meeting understood Dick to be referring to Witherell.

In February 1986, Witherell called Merle Kirby, chairman of the County Board, and asked to meet with him over lunch. Kirby assented. Witherell told Kirby the employees in the county could work

out their problems without bringing in the union. Witherell told Kirby that Dick was abusing and mistreating the employees at the nursing home and all the problems could be cured if Dick was discharged. Kirby told Witherell that Dick thought only three to four employees were causing all the problems at the nursing home. Witherell said that was not true. Kirby said he would go to the nursing home and talk to the employees; however, he never did.

Also in February 1986, Dale Allen was assigned to assist Witherell. Allen had a learning disability, which made it difficult to perform complicated tasks. Witherell taught Allen to perform some of the simpler tasks, such as mowing the yard, trimming the weeds, and painting curbs. In March 1986, Allen began complaining to Dick that Witherell was harassing him because of his union preference. Dick would then call Witherell into his office and tell Witherell to stop. Witherell believed Allen complained to Dick when he assigned Allen a job which Allen thought was distasteful.

Beginning in April 1986, employees at Sunny Acres started wearing buttons either for or against the union. Witherell wore a button stating "We Care, We Count, AFSCME Ill." Dick saw Witherell wearing the button and posting union literature on the bulletin board. Between early February and the June 6, 1986, election, Witherell hosted 25 to 30 union meetings at his house. Witherell also sat with the union representative at meetings with agents of the Labor Board. Witherell was very open about his support for the union.

On May 29, 1986, Witherell was taking his 2 p.m. break with some of the housekeepers outside by the nursing home's utility shed. After the break, Dick accused Witherell of holding a union meeting in the shed. Witherell denied he was holding a union meeting. Dick told Witherell not to hold any union meetings in the shed.

On June 4, 1986, two days before the union election, Dick came to see Witherell in the maintenance shop. Dick told Witherell he did not want Witherell working inside the building that day and that he instead wanted Witherell to work outside. When Witherell asked why, Dick responded he did not want Witherell in the building where he could "talk union." He also told Witherell he did not want Witherell to "talk union" to the laundry supervisor on the job.

On the evening of June 5, 1986, the night before the union election, Witherell called Dan Austin, chairman of the advisory board. Witherell told Austin he had some of the employees from the nursing home at his house and wanted Austin to come speak to them. Austin refused. Witherell then stated he would bring the employees over to Austin's house. Again, Austin refused. Witherell then told Austin if

he knew what was good for him, he would get out there right away.

After speaking with Austin, Witherell then called County Board member Everett Moss. Moss came to speak with the employees. When Moss arrived, Witherell was present with the employees, as well as neighbors of Witherell, who were asked to witness the conversation. The employees told Moss that Barbara Gordon, the assistant administrator at the nursing home, had been asking them to frame Witherell's wife, who is also employed by the nursing home, so that she would be fired. Moss promised to do something and came to the nursing home the next day to meet with Dick. Because of the election, however, he decided to take no action.

At the next advisory board meeting, held June 24, 1986, Austin told the County Board he felt Witherell had threatened him on June 5, 1986. Moss told the County Board of the employees' complaints regarding Gordon. The County Board dismissed the employees' complaint as absurd and instructed Dick to issue Witherell a written reprimand for his remarks to Austin. Because of prior warnings, Dick wanted to terminate him. The County Board convinced Dick that was not a good idea because of Witherell's activity on behalf of the union. Dick met with Witherell on June 26, 1986, to give him the written reprimand. Witherell said nothing when the reprimand was issued. Once Dick gave Witherell the reprimand, Witherell sarcastically responded, "Thank you very much," and left.

On August 4, 1986, C.T. Young, regional architect for the Illinois Department of Public Health, performed an inspection survey of the nursing home. Young inspected the premises to monitor compliance with State and Federal regulations. When Young finished his inspection, he cited the nursing home for five repeat violations of the regulations. Dick attributed the three most serious of these to Witherell. The first violation concerned the door on the housekeeping smoking lounge, which overlapped its frame by one inch and, therefore, did not close properly. The second violation concerned the doors to the sun room. Regulations required these doors be opened by 15 pounds of pressure or less; however, the doors were very difficult to open. The third and most critical violation concerned the propping open of the inside fire doors with wedges. Young threatened to force the nursing home to install a very expensive system to insure the doors automatically closed if the practice of propping open the doors with wedges was not discontinued.

Dick met with Witherell on the morning of August 4, 1986, to inform him of the deficiencies. Dick told Witherell of the problem with the doors being propped open and told him he was responsible for en-

suring compliance. Witherell protested, asking how he could be held responsible if he was on the roof fixing an air conditioner, or if he happened to be in Springfield that day. Dick told Witherell he could spot-check the premises on the evenings and weekends. Dick then told Witherell to inspect the premises and remove all the wedges. Dick posted a memo to all employees informing them that wedges were not to be used to prop doors open and that Witherell was responsible for monitoring compliance. On August 5, 1986, Dick gave Witherell notice that failure to correct all deficiencies by an agreed upon date would result in discipline.

On August 5, 1986, Dick found a door propped open with a wedge. Dick told Witherell he needed to do a better job monitoring compliance. The director of nursing found the doors to the laundry room, maintenance room, and boiler room propped open on August 7, 8, and 10, 1986. Witherell had been present on each of these days. Dick gave the laundry supervisor a written warning for leaving the laundry door propped open and was going to do the same with Witherell. However, Witherell was terminated before Dick had an opportunity to issue the written warning.

For several years, the nursing home had problems with its sewer system. The sewage from the kitchen had clogged the sewer pipes in one of the nursing home's five wings, the D wing. The result of this was the sewage would back up into the kitchen, laundry room, and throughout the D wing. In order to clean out the sewer, Witherell had to remove the toilet from the D-1 bathroom and pass an eel through the sewer pipes to break up and dislodge the clog. The sewage problem was so bad Witherell was forced to dislodge a clog sometimes as often as two or three times a month. Frequently the clog was not fully dislodged and the procedure would have to be repeated more than once a day. The toilet was replaced after each time the sewage pipes were cleaned and the household staff was informed, so as to clean up the D-1 bathroom.

Dick was aware of the procedure for unclogging the sewer pipes. As the eel used by Witherell was not long enough to reach the clog from the clean-out in the D-wing hall, Witherell suggested the nursing home purchase a longer automatic eel, and that a new clean-out be installed in the D-wing hall closer to where the sewer pipes clogged. Dick, however, rejected these suggestions and instructed Witherell to continue to remove the clogs in the same manner.

On August 8, 1986, the director of nursing received a complaint from a resident's family that the D-1 bathroom had been out of order for a long time. When she investigated, she found a blanket on the

floor with dried excrement on it, the sewage hole open, the toilet pushed under the sink with excrement on it, and excrement on the floor and baseboards. She immediately questioned her nurses and nurses' aides about it, one of whom said the bathroom had been that way for over a month.

The director of nursing informed Dick of the condition of the D-1 bathroom, and Dick performed his own investigation. Dick concluded the stool had been off the D-1 bathroom for almost two months. As a result of the investigation into the D-1 bathroom incident, by the end of September the housekeeping supervisor received a three-day suspension for neglecting her responsibilities and 36 nurses' aides received verbal warnings.

On August 14, 1986, Witherell arrived at Sunny Acres at 6:45 a.m. and checked the building and grounds pursuant to his morning routine. The day before, Witherell had told Allen to mow the grass around the nursing home's gazebo and clean up the area. Allen had mowed the grass such that clippings were strewn across the sidewalks and gazebo. Shortly after 7 a.m., Witherell told Allen the gazebo area "looks like shit," and that if it was not cleaned out by 10 a.m. when the patients' families started to arrive "the shit was going to hit the fan." Allen went immediately to Dick's office to complain about the way he had been treated. Dick had not yet arrived, so Allen waited until Dick arrived at approximately 8 a.m. Allen told Dick what Witherell had said to him. Dick's secretary witnessed and transcribed the conversation.

Dick then called Witherell into his office. Dick confronted Witherell with Allen's accusations and asked Witherell whether that was a proper way to talk to a subordinate. Witherell denied saying "the shit will hit the fan." Dick advised Witherell the incident warranted a written reprimand for failure to exhibit appropriate supervisory conduct. Witherell stated Allen complained to Dick whenever he did not want to do a job. Dick concluded the conversation by stating Witherell should use corrective discipline with Allen. Dick then asked Witherell about the stool in the D-1 bathroom. Dick told Witherell he was negligent in leaving the stool off for such a long time. Witherell said Dick was aware of the problem in the D-1 bathroom. Dick asked Witherell how long the stool had been off and Witherell replied it had been off for approximately one day, sometimes longer. Dick then expressed dissatisfaction with a manner in which Witherell handled the D-1 bathroom incident. Dick's secretary was present to witness and transcribe this conversation. Dick took no disciplinary action against Witherell at this time, but continued to investigate.

Witherell went back to the maintenance shop and found Allen there. Allen asked what he should do next. Witherell told him to finish painting the curbs, which he had started the day before. Allen again went directly to Dick. Allen told Dick Witherell had instructed him to paint the curb and he did not know what paint to use. Dick accompanied Allen back to the maintenance shop to confront Witherell. When he arrived at the maintenance shop, Dick asked Witherell for the paint. Witherell told Allen it was in the cabinet. Allen then said that he needed a pan and brush. Witherell asked Allen where he had left his pan and brush from the time before. Allen said they were in the shed. Witherell told Allen to go get them. Dick told Witherell to accompany him and Allen out to the shed to get Allen's supplies.

As they were walking toward the shed, Witherell lost his temper and said, "I've about had it with you." Dick said, "What are you going to do about it?" Witherell responded, "I'd like to meet you in front of the building some night after work." Dick said, "Don't get cocky with me, bucko." Witherell said, "Just walk away, walk away." Dick then told Witherell he was out of line. Witherell stated, "I would like to meet you on a country road and flatten you." Dick said, "So you're going to wait on a country road for me?" Witherell responded, "Raise a hand, just raise a hand." Dick told Witherell he was suspended and to clock out. Witherell said he would clock out when he was good and ready. Dick said, "I'm ordering you to clock out now." They then walked back to the building together. Witherell got into his truck and left. Both Mervin Lascelles, a maintenance assistant, and Allen were present during this interaction.

On August 20, 1986, a predisciplinary hearing was held. Present during this hearing were County Board member John Hollis, County attorney Tim Reardon, Dick and his secretary, Tom McLaughlin and Norma Duba from AFSCME, and Witherell. At the opening of the meeting Dick read the charges against Witherell, which consisted of disruptive behavior and disorderly conduct in the incident of August 14, 1986; gross negligence in regard to the removal of the toilet from the sewer pipe in the D-1 bathroom; failure to follow instructions to check the building and ensure compliance with the propping open of doors or the use of wedges; and failure to exhibit appropriate supervisory conduct over employee Dale Allen regarding Witherell's remarks that the gazebo area "looked like shit" and "the shit was going to hit the fan." The advisory board unanimously recommended the County Board discharge Witherell. At a later executive session, the County Board voted unanimously to discharge Witherell.

The ISLRB has found the elements necessary to prove an unlawful discharge are (1) union or protected concerted activity, (2) employer knowledge of such activity, (3) animus toward such activity, and (4) an adverse employment action under suspect circumstances. *County of Peoria*, 3 Pub. Employee Rep. (Ill.) par. 2028, No. S—CA—336 (Illinois State Labor Relations Board, March 23, 1987).

 However, under the *Wright Line* doctrine, more is involved when evidence is introduced to show the employee might have been discharged regardless of any antiunion animus. Our supreme court recently had occasion to consider whether an employee discharge constituted an unfair labor practice charge under the Act in *City of Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335, 538 N.E.2d 1146. There, the court discussed the proof requirements in such cases as follows:

"Where an employer is charged with an unfair labor practice because of the discharge of an employee engaged in protected activity, the charging party must first show, by a preponderance of the evidence, that the adverse employment action was 'based in whole or in part on antiunion animus—or *** that the employee's protected conduct was a substantial or motivating factor in the adverse action.' (*NLRB v. Transportation Management Corp.* (1983), 462 U.S. 393, 401, 76 L. Ed. 2d 667, 675, 103 S. Ct. 2469, 2474.) Since motive is a question of fact, the Board may infer discriminatory motivation from either direct or circumstantial evidence, and, because motive involves a factual determination, the Board's finding must be accepted if supported by substantial evidence. (*NLRB v. Nueva Engineering, Inc.* (4th Cir. 1985), 761 F.2d 961, 967.) Antiunion motivation may reasonably be inferred from a variety of factors, such as an employer's expressed hostility towards unionization, together with knowledge of the employee's union activities (*Turnbull Cone Baking Co. v. NLRB* (6th Cir. 1985), 778 F.2d 292, 297), proximity in time between the employees' union activities and their discharge (*NLRB v. E.I. DuPont De Nemours* (6th Cir. 1984), 750 F.2d 524, 529), disparate treatment of employees or a pattern of conduct which targets union supporters for adverse employment action (*Eisenberg v. Wellington Hall Nursing Home, Inc.* (3rd Cir. 1981), 651 F.2d 902, 905; *NLRB v. Supreme Bumpers, Inc.* (6th Cir. 1981), 648 F.2d 1076, 1077), inconsistencies between the proffered reason for discharge and other actions of the employer (*Turnbull*, 778 F.2d at 297), and shifting explanations for the discharge (*NLRB v. Dorothy*

*Shamrock Coal Co.* (7th Cir. 1987), 833 F.2d 1263, 1268; *NLRB v. Rich's Precision Foundry, Inc.* (7th Cir. 1981), 667 F.2d 613, 626)." (*Burbank,* 128 Ill. 2d at 345-46, 538 N.E.2d at 1149-50.) The supreme court went on to state once the charging party has established a case of discharge based in part on antiunion animus, the employer can avoid a finding it violated the statute by demonstrating the discharged employee would have been fired for a legitimate business reason notwithstanding the employer's antiunion animus. This then triggers a determination of whether the reasons advanced are *bona fide* or pretextual. As stated by the court, when the employer advances legitimate reasons for the discharge and is found to have relied upon them in part, then the case is characterized as one of "dual motive." The employer must then demonstrate by a preponderance of the evidence that the employee would have been terminated notwithstanding his union involvement. (*Burbank,* 128 Ill. 2d at 346-47, 538 N.E.2d at 1150, citing *NLRB v. Transportation Management Corp.* (1983), 462 U.S. 393, 400-02, 76 L. Ed. 2d 667, 674-76, 103 S. Ct. 2469, 2473-74, and *Roscello v. Southwest Airlines Co.* (5th Cir. 1984), 726 F.2d 217, 222-23.) Whether the employer's evidence meets the preponderance standard is itself a question of fact, and, as such, the agency's determination thereon must be accepted as *prima facie* true and correct.

■ This court discussed the standard of review applicable to administrative review actions in *Agans v. Edgar* (1986), 142 Ill. App. 3d 1087, 1093, 492 N.E.2d 929, 933:

" 'That an opposite conclusion might be reasonable or that the court might have reached a different conclusion is not adequate to set aside the agency's decision.' (*O'Boyle v. Personnel Board* (1983), 119 Ill. App. 3d 648, 653, 456 N.E.2d 998, 1002-03.) In our research, we find that other districts have alternatively stated the rule as follows: In order to set aside the agency decision the reviewing court must find that all 'reasonable and unbiased persons, acting within the limits prescribed by law and drawing all inferences in support of the finding, would agree that the finding is erroneous.' (*Daniels v. Police Board* (1976), 37 Ill. App. 3d 1018, 1023, 349 N.E.2d 504, 508; *O'Boyle v. Personnel Board* (1983), 119 Ill. App. 3d 648, 456 N.E.2d 998; *Hahn v. Police Pension Fund* (1985), 138 Ill. App. 3d 206, 485 N.E.2d 871; see *Sicinski v. Will County Police Department Merit Com.* (1985), 131 Ill. App. 3d 966, 476 N.E.2d 808; *Knop v. Department of Registration & Education* (1981), 96 Ill. App. 3d 1067, 421 N.E.2d 1091.)"

This court went on to refer to the standard of review stated in *Jackson v. Virginia* (1979), 443 U.S. 307, 318, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89, and held that for a reviewing court to find an agency's decision against the manifest weight of the evidence, the reviewing court must determine, after viewing the evidence in the light most favorable to the agency, that no rational trier of fact could have agreed with the agency's decision. (*Agans*, 142 Ill. App. 3d at 1093-94, 492 N.E.2d at 933.) That this court might have reached a different conclusion is not an adequate basis to set aside the decision on appeal.

■ Here, the ISLRB found the supervisor's recommendation that Witherell be discharged was, in part, illegally motivated, which is the basis for the County to be found in violation of the Act. Viewing the evidence in the light most favorable to the ISLRB, we are unable to say no rational trier of fact could agree with that assessment.

■ In this difficult case, the County was then required to show the employee would have been discharged in any event. The Labor Board found the County did not prove this assertion by a preponderance of the evidence. It is not our province to reweigh the evidence. Nor can we say the record is so devoid of evidence to support the requisite inferences as to require an opposite result. We do not suggest by our holding the County of Menard had an antiunion animus, but certain of the administrator's conduct was deemed by the ISLRB to support the inference of antiunion bias and some unlawful motivation in pursuing the employee's discharge. The ISLRB also concluded the employer did not meet the standard of proof to show the discharge was for other legitimate reasons.

While it may have been reasonable in a practical sense to discharge an employee whose troublesome relations with his superior were disruptive, particularly when the proffered reasons for discharge appeared legitimate, the Act places the factual determination of whether the employment action constituted an unfair labor practice in the ISLRB. This determination was not contrary to the manifest weight of the evidence.

Affirmed.

LUND and GREEN, JJ., concur.